FILED

2021 Jun-25  PM 01:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **JOHN DOE,** | ) | **CASE NO.** |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| | ) | |
| **SAMFORD UNIVERSITY; MALLORY** | ) | |
| **KRUNTORAD; and TIM S. HEBSON, Ed.D.,** | ) | |
| | ) | |
| **Defendants.** | ) | **(JURY TRIAL DEMANDED)** |

**COMPLAINT**

Plaintiff John Doe,[1] by and through counsel, for his Complaint against Defendants Samford

University ("SU"), Mallory Kruntorad ("Defendant Kruntorad"), and Tim S. Hebson, Ed.D.

("Defendant Hebson") (the foregoing are hereinafter collectively referred to as the "Defendants"),

states as follows:

**INTRODUCTION**

1.      This Complaint arises out of the actions and inactions taken and procedures

employed by Defendants, jointly and/or severally, concerning allegations made against Plaintiff

John Doe ("John"), a male senior student at SU, for violations of institutional policy related to

alleged non-consensual sexual intercourse with a fellow SU student, Jane Roe.

2.      A non-exhaustive list of Defendants' wrongful actions include the following: (i)

Defendants failed to provide adequate written notice of the sexual misconduct policy violations in

---

[1] Simultaneous to the filing of this Complaint, John Doe is filing a Motion to Proceed under Pseudonym and for Protective Order in order to protect the identities of all students referenced in the pleadings and exhibits.

issue; (ii) Defendants failed to conduct a thorough and impartial investigation; (iii) Defendants evidenced gender bias against John throughout the investigatory process; (iv) Defendants made assessments of credibility regarding each party and witnesses without any ascertainable rationale or logic; (v) Defendants failed to consider material evidence presented by John; (vi) Defendants failed to consider Jane Roe's shifting recollections and narratives in the decision-making process, (vii) Defendants failed to afford John the requisite presumption of innocence; and (viii) Defendants failed to provide a rationale for the sanctions imposed on John, all of which demonstrated violations of Title IX of the Education Amendments of 1972 ("Title IX") and other state laws.

3.      Defendants subjected John to disciplinary process that was not fair and impartial, but rather one that discriminated against him on the basis of his sex.

4.      SU took Jane Roe at her word, in spite of glaring credibility issues, including, but not limited to, the fact that her narrative regarding her level and/or cause of intoxication on the night of October 31, 2020, shifted throughout the Title IX process.

5.      Moreover, Defendants failed to follow SU's process set forth in the Samford University Sexual Misconduct Policy ("Policy").

6.      John has been damaged by the actions of Defendants. As a senior at SU, John is now unable to graduate, and his education and career prospects have been severely compromised.

7.      As a result of Defendants actions and inactions, either jointly and/or severally, John has suffered psychological, emotional, and reputational damages, economic injury, and the loss of educational and career opportunities.

8.      John, therefore, brings this action to obtain relief based on claims a violation of Title IX and/or other state law claims.

2

## PARTIES

9.      John, until his unlawful suspension, was an undergraduate student at SU, residing in Birmingham, Alabama. He is currently a resident of Alabama.

10.     Upon information and belief, SU is a private Christian university located in the Birmingham, Alabama.

11.     Upon information and belief, Defendant Kruntorad is a resident of the state of Alabama and served as the Residence Life Coordinator and Title IX Investigator at SU at all relevant times herein.

12.     Upon information and belief, Defendant Hebson is a resident of the state of Alabama and served as Student Conduct Coordinator and Title IX Coordinator at SU at all relevant times herein.

13.      SU has the authority to grant the injunctive relief sought in this Complaint.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this action: (i) under 28 U.S.C. §§ 1331 and 1343 because this action arises, in part, under the laws of the United States—Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. §§ 1681 *et seq.*; and (ii) pursuant to the principles of supplemental jurisdiction under 27 U.S.C. § 1367.

15.     This court has personal jurisdiction over Defendants as they are domiciled in and/or conduct business in the State of Alabama.

16.     This Court is authorized to grant the declaratory relief sought under 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 57 and 65.

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

3

## BACKGROUND FACTS

### Title IX Enforcement

18.     On April 11, 2011, The United States Department of Education's ("USDOE") Office of Civil Rights ("OCR") issued its now infamous "Dear Colleague Letter," which instructed universities on how to investigate and resolve complaints of sexual misconduct under Title IX, the statute that forbids discrimination on the basis of sex by institutions that accept federal funding ("Dear Colleague Letter" available at https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html).

19.     Educational institutions designed to educate America's youth are ill-equipped to adjudicate allegations of sexual assault, remain wary of bad publicity, and continue to overreact to the threat of federal investigations, sanctions, and lawsuits, in part by discriminating against male students on the basis of their sex.

20.     As colleges and universities like SU become quasi-criminal investigators, they institutionalize unfair procedures that lead to unfair and unreasonable punishments of students accused of misconduct.

21.     OCR has warned schools to provide basic procedural protections to students, instructing that grievance procedures must provide "[a]dequate, reliable, and impartial investigation of complaints, including the opportunity for both parties to present witnesses and other evidence," and "equitable grievance procedures." *See* Dear Colleague Ltr.

4

22.     Further, in 2017, in interim guidance issued after rescinding the 2011 Dear Colleague Letter,[2] OCR "cautioned" schools "to avoid conflicts of interest and biases in the adjudicatory process and to prevent institutional interests from interfering with the impartiality of the adjudication." Q&A on Campus Sexual Misconduct, Sept. 22, 2017, at 5 (available at https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf).

23.     OCR advised that written notice of any allegations should be provided to an accused "with sufficient time to prepare a response before any initial interview" and that parties subsequently "should have the opportunity to respond to [a] report in writing in advance of the decision of responsibility and/or at a live hearing to decide responsibility." *Id.* at 4-5.

24.     OCR instructs schools to "maintain documentation of all proceedings, which may include written findings of facts, transcripts, or audio recordings." *Id.* at 5.

25.     Under the 2020 amendments to the Title IX regulations, all university grievance processes must "provide both parties equal opportunity to review and respond to the evidence gathered during the investigation. *See* a copy of the Final Rule, available at https://www2.ed.gov/about/offices/list/ocr/docs/titleix-regs-unofficial.pdf, at pg. 98; 34 C.F.R § 106.45.

26.     The new regulations further require that schools provide an accused student with "written notice of the allegations with sufficient details to permit parties to prepare for an initial interview, which the [university] must send to both parties upon formal receipt of the complaint." *Id.* at pg. 102.

---

[2] Even though USDOE formally rescinded the 2011 Dear Colleague Letter on September 22, 2017, schools continue to enforce the policies and procedures instituted in response to it.

27.     Written notice is further required "in advance of any meeting, interview, or hearing conducted as part of the investigation or adjudication." *Id.*

28.     Further, universities must prepare and send to both parties an "investigative report that summarizes all the relevant evidence including inculpatory and exculpatory evidence. *Id.* at pg. 101.

29.     Additionally, among other requirements, schools must:

- Presume the innocence, or non-responsibility, of a respondent. 34 C.F.R. § 106.45(b)(2).

- Prohibit the use of Title IX coordinators, investigators, or decision-makers who have conflicts of interest or bias against complainants or respondents, generally, or against an individual complainant or respondent. *Id.*

- Provide training to all Title IX personnel on "how to serve impartially and avoid prejudgment of the facts at issue, conflicts of interest, and bias, and that materials used in such training avoid sex stereotypes." 34 C.F.R. § 106.45(b)(1).

- Publicly publish their Title IX training materials on their website. *Id.*

- Prohibit credibility determinations based upon a person's status as a complainant, respondent, or witness. *Id.*

- Provide the parties and their advisors all of the evidence, including inculpatory and exculpatory evidence, as well as the investigative report, either electronically or in hard copy at least 10 days prior to a hearing or prior to the due date for a written response. 34 C.F.R. § 106.45(b)(3).

- Provide the parties live hearings with cross-examination conducted "directly, orally, and in real time," by the party's advisor, instead of through written questions. *Id.*

30.     SU has adopted certain policies and procedures for the investigation and adjudication of alleged sexual misconduct in an attempt to comply with Title IX.

31.     SU exhibited stark bias in its Inside Samford Magazine Fall 2019 when it announced to its constituency: "Once Prohibited Conduct is reported the Title IX Coordinator will conduct an initial assessment in which the well-being of the complainant is paramount."

32.     This preference for the alleged victim makes sense given an article where SU promoted an "It's on Us Initiative" and touted "every 21 hours there is a rape on an American college campus."

33.     With this fear in mind, SU's Title IX process as applied to John fell far short of the requirements for a fair Title IX proceeding.

34.     During the pendency of John's case, the Title IX office showcased a documentary "Nevertheless," also raising awareness on sexual assault.

**SU's Sexual Misconduct Policy**

35.     SU adopted the "Samford University Sexual Misconduct Policy" ("Policy"). A copy of Policy is attached as Exhibit 1

36.     The Policy notes that "sexual misconduct" is an umbrella term for a variety of unwelcome behaviors, including Sexual Assault. *Id.* at 3.

37.     The Policy defines "Sexual Assault" as "any actual or attempted sexual contact using any object with another person without that person's consent." *Id.* at p. 7

38.     The Policy includes the following examples of Sexual Assault: (a) rape, (b) fondling, (c) incest, and (d) statutory rape. *Id*.

39.     The Policy further defines "Rape" as "the penetration, no matter how slight, of the vagina or anus with any body part or object, oral penetration, by a sex organ or another person, or oral contact with a sex organ of another person, without the consent of the complainant." *Id*.

4851-1818-5966, v. 5

40.     The Policy further defines "Fondling" as "the touching of the intimate parts (including the genital area, groin, inner thigh, buttocks, or breast) of another person for the purpose of sexual gratification, without the consent of the complainant." *Id.*

41.     The Policy defines "Consent" as follows:

Consent is clear, voluntary permission. Consent is not effective it results from forcible compulsion, which is the use or threat of physical force, intimidation, coercion, or other conduct that eliminates or compromises an individual's ability to freely choose whether to have sexual contact…

An individual incapacitated by alcohol or drug consumption (whether voluntarily or involuntarily) or who is asleep, unconscious, unaware, or otherwise physically helpless, is considered unable to give consent to sexual activity. A person who is incapacitated may be unable to give valid consent if he or she is not able to understand the 'who, what, where, when, why, and/or how' of the sexual interaction…Sexual activity with someone that an individual knows or reasonable should know is intoxicated or otherwise incapable of giving consent is a violation of [the Policy] …. Common indications that a person may be incapacitated or approaching incapacitation include vomiting, unsteady gait, slurred speech, an odor of alcohol, incontinence, combativeness, and emotional volatility….

*Id.* at pp. 9-10.

42.     The Policy also states that SU will "provide a fair and impartial complaint resolution process," which is further defined as a process that:

treats the parties equitably, provides the complainant an opportunity to file a formal complaint alleging a violation of [the Policy] and an opportunity to present evidence of the allegations prior to a decision on responsibility, and provides the respondent notice of the allegations and an opportunity to respond to and present evidence related to those allegations prior to a decision on responsibility, and provides both parties an opportunity to challenge the credibility of the other party and any witnesses prior to a decision on responsibility.

*Id.* at pp. 17-18.

8

43.     The Policy states that the complaint resolution process "will require an objective evaluation of all relevant evidence, including both inculpatory and exculpatory evidence." *Id.* at p. 18.

44.     The burden of gathering evidence sufficient to reach a determination regarding responsibility rests on the University and not on the parties. *Id.*

45.     The Policy states that each complaint resolution process will be conducted by "individuals…who do not have a conflict of interest or bias for or against complainants or respondents generally, or for or against the individual complainant or respondent." *Id.*

46.     The Policy also states that the individuals who conduct the complaint resolution process will receive annual training on various subjects including, but not limited to, how to serve impartially, including by avoiding prejudgment of the facts at interest, conflicts of interest, and bias. *Id.* at p. 19.

47.     The Policy states that, upon receipt of a formal complaint, the Title IX Coordinator will conduct an initial assessment of the allegation(s) to determine if the formal complaint states an allegation of "Sexual Misconduct." *Id.* at p. 26.

48.     The Policy states that if the formal complaint alleges Sexual Misconduct, the Title IX Coordinator must provide a written notice of allegations to the parties. *Id.* at p. 27.

49.     According to the Policy, the written notice will include, without limitation, the following: (1) Notice of the University's complaint resolution process, including the informal resolution process; (2) Notice of the allegations, including the identities of the parties involved in the incident(s), if known, the conduct allegedly constituting Sexual Misconduct, and the date and location of the alleged incident, if known; (3) A statement that the respondent is presumed not

9

responsible for the alleged conduct and a determination regarding responsibility is made at the conclusion of the complaint resolution process; (4) Notice that the parties have the right to an advisor of choice; (5) Notice that the parties have the right to inspect and review evidence; (6) Notice of Policy provisions that prohibit knowingly making false statements or knowingly submitting false information during the complaint resolution process; and (7) If the University decides to investigate allegations about the complainant or respondent that are not included in the notice provided, the notice will be updated to provide notice of the additional allegations to the parties. *Id.*

50.     When the Title IX Coordinator receives a formal complaint of Sexual Misconduct, the Title IX Coordinator will attempt to schedule an initial meeting with the respondent.  Prior to or during the initial meeting, the Title IX Coordinator will: (1) Notify the respondent of the complaint and the alleged Policy violations; . . . (3) Notify the respondent of the importance of preservation of evidence; . . . (5) Notify the respondent of any supportive measures that have been put in place that directly relate to the respondent (i.e., no contact directive). *Id.*

51.     The Policy states that the initial review of the formal complaint by the Title IX Coordinator and initial notice of the allegations to the parties will customarily take no more than ten (10) calendar days. *Id.*

52.     According to the Policy, the Title IX Coordinator will designate one or more investigators "to conduct a prompt and equitable investigation." *Id.* at 29.

53.     The Policy states that the complainant and respondent will have the opportunity to "advise the investigator(s) of any witnesses they believe should be interviewed, other evidence they believe should be reviewed by the investigator(s), and questions they would like the

investigator(s) to consider asking the other party and any witnesses, including questions challenging credibility." *Id.* at pp. 29-30.

54.     The Policy states that SU will strive to complete the investigation within forty-five (45) calendar days from the date the formal complaint and notice of allegations are provided to the investigator. *Id.* at p. 30.

55.     At the conclusion of the investigation, the investigator must prepare a written investigation report (the "Investigation Report") that fairly summarizes the relevant evidence. *Id.*

56.     The Policy states that the parties will have a ten (10) calendar day period to review the evidence and prepare a written response to the evidence.

57.     The Title IX Coordinator will review the parties' response to the evidence and may remove or redact and portions of the response.  Moreover, the investigator will also consider the parties' response to the evidence prior to completion of the Investigation Report. *Id.* at 31.

58.     Upon completion of the Investigation Report, the parties will have five (5) calendar days to review the Investigation Report and prepare a written response.

59.     Prior to the hearing, the Title IX Coordinator will review the Investigation Report and has discretion to ask an investigator for clarification, additional investigation, and/or to have information added to or redacted from the Investigation Report. *Id.* at 34.

60.     Upon completion of the investigation, the Title IX Coordinator will compile the adjudication file that will be shared with members of the three-person Title IX Hearing Panel.

61.     The Title IX Hearing Panel is tasked with conducting a prompt and equitable hearing and then making a determination regarding responsibility based on a preponderance of the evidence standard. *Id.* at p. 34.

11

62.     The Policy is silent as to how a decision of responsibility or sanctions is determined by the Title IX Hearing Panel.

63.     During the hearing, "each party's advisor will be permitted to ask the other party and any witnesses all relevant questions and follow-up questions, including those challenging credibility." *Id.* at 35.

64.     During the hearing, "the presumption is that the respondent is not responsible for a Policy violation," and the respondent will only be deemed responsible for a Policy violation if the Title IX Hearing Panel concludes there is a violation by a "preponderance of the evidence." *Id.* at p. 34-36.

65.     The Policy states that "if… a witness is not willing to answer any relevant question from either advisor, the Title IX Hearing Panel will not rely on any statement of that… witness in reaching a determination regarding responsibility." *Id.* at p. 35.

66.     The Policy states that if a respondent is found to be in violation of the Policy, the Title IX Hearing Panel has the discretion to impose sanctions depending on the severity of the offense. *Id.* at p. 37.

67.     The Policy states that the complainant and respondent will simultaneously receive the Notice of Determination from the Title IX Hearing Panel. *Id*. at pp. 38-39.

68.     A party has the ability to appeal the Title IX Hearing Panel's decision to the Title IX Coordinator within seven (7) days following the date the Notice of Determination was sent out. *Id.* at p. 40.

69.     The Policy allows for an appeal based on the following grounds: (1) a procedural irregularity that affected the outcome of the matter; (2) new evidence that was not reasonably

12

available at the time of the determination that could affect the outcome of the matter; and (3) the Title IX Coordinator, investigator(s), or a Panel member had a conflict of interest or bias for or against complainants or respondents generally or the individual complainant or respondent that affected the outcome of the matter.

### John Doe and Jane Roe Met at an Off-Campus Halloween Party and Engaged in Consensual Sexual Intercourse

70.     At approximately 9:30 p.m., John arrived at a friend's apartment, located off SU's campus, in The Oaks apartment complex (the "Friend's Apartment").

71.     John brought to the Friend's Apartment two pitchers of Halloween-themed alcoholic beverages that he made using recipes he found on Pinterest.  One drink was named Pumpkin Juice, coined from Harry Potter.

72.     Pumpkin Juice contained two cups of ginger ale, 28 ounces of pumpkin puree, 8 cups of apple juice, 1 cup of fireball whiskey, and 1 cup of rum.  In total, the drink was, at most, seven percent (7%) alcohol.

73.     John brought the pitcher of Pumpkin Juice to a Halloween party at a nearby apartment also located in The Oaks apartment complex (the "Party").

74.     That same evening, Jane Roe was picked up by two friends and went to the Party.

75.     Jane Roe wore a black unitard with one shoulder exposed and a skirt.

76.     Jane Roe stated at the hearing that she consumed alcoholic beverages prior to arriving at the Party.

77.     Upon information and belief, when Jane Roe arrived at the party, she felt fine.

13

78.     Shortly after arriving at the Party, Jane Roe's friend offered her a sip of the Pumpkin Juice that John brought to the party.

79.     John and Jane Roe met for the first time ever that evening at the Party.

80.     Jane Roe approached John and complimented him on the Pumpkin Juice he made, at which point they began a conversation.

81.     Upon information and belief, Jane drank some Pumpkin Juice poured from the same pitcher that others at the Party poured from and drank from.  John also poured himself a cup of Pumpkin Juice.

82.     Jane Roe commented to John about the loud noise level at the Party.  John suggested that they go to the nearby Friend's Apartment where it was quieter so they could talk.

83.     Jane Roe did not appear intoxicated.

84.     Jane Roe agreed to go to the Friend's Apartment with John, and she left the Party with John.

85.     No one stopped Jane Roe from leaving the Party with John.

86.     From the time Jane Roe met John to the time she left the Party with John, approximately twelve minutes passed, according to Jane Roe.

87.     Jane Roe and John talked and shared personal information about themselves with each other.

88.     Jane Roe told John that she was a freshman, what her major was at SU, and that she was going to be initiated into a sorority.

89.     At the Friend's Apartment, Jane Roe texted Witness #2 and said that she left the Party with John.

14

90.     At the Friend's Apartment, John and Jane Roe talked about Jane Roe being excited about her sorority. Eventually, Jane Roe asked John if he wanted to "hook up."

91.     John asked Jane if she was sure she wanted to engage in sexual activity with him, and she confirmed that she did.

92.     Several times before and during their consensual sexual intercourse, John asked Jane Roe for her consent, and Jane Roe expressed consent, as he wanted to abide by the training he received on obtaining consent at SU.

93.     Upon information and belief, Jane Roe told John that she had an intrauterine device (IUD).

94.     Jane Roe asked John to unzip her skirt.

95.     Jane Roe did not remove her unitard and her breasts were not exposed during the consensual sexual interaction with John.

96.     At all times during the consensual sexual intercourse, Jane Roe had control over her speech and bodily movements.

97.     At all times during the consensual sexual intercourse, Jane Roe's words and actions indicated to John that she understood the who, what, where, when, why, and/or how of the sexual interaction.

98.     Jane Roe asked John if he achieved an orgasm.  John told Jane Roe that he had not, at which point Jane Roe appeared to John to be annoyed with him.

99.     After the sexual intercourse ended, Jane Roe re-dressed on her own, left the Friend's Apartment, descended a staircase, and returned to the Party, all without any assistance from John.

15

100.    When Jane Roe was walking down the staircase, John asked her if a purse belonged to her, and she confirmed that the purse did not belong to her.

101.    Upon her return to the Party, Jane Roe told Witness #2 that she was sexually assaulted by John.

102.    Jane Roe asked Witness #2 to get her bag that she brought to the Party, and then Jane Roe went outside.

103.    Outside of the Party, Jane Roe called two different friends to pick her up.  She even sent her location to a friend so he could find her and pick her up.

104.    Jane Roe did not want her sister (Witness #1) to know that she went to the Party and had sexual intercourse with John.

105.    Jane Roe worried that her parents would pull her out of SU.

106.    Jane Roe's sister (Witness #1) arrived at the outside location where Jane was and asked what was going on.

107.    John was inside the Party and Witness #3 asked him to go outside.  John agreed.

108.    Outside of the party, a group of male and female students approached John and asked him if he drugged Jane Roe to have sex with her.

109.    A female outside asked John what he put in Jane Roe's drink.  John responded that he put "everything in her drink," meaning that he made the Pumpkin Juice.

110.    Someone recorded the confrontation with John.

111.    Jane Roe's sister (Witness #1) took Jane back to Jane's dorm.

112.    Jane Roe reported that John raped her, gave her hickeys, and bit her lip and breast.

113.    Jane Roe's sister (Witness #1) took photos of Jane's alleged injuries.

16

114.    The following day, Jane Roe filed a police report against John.  Jane's blood was drawn to test for the presence of drugs. John never saw the results of the blood test.

115.    Approximately three weeks later, Jane Roe was finally seen by the Crisis Center on or about November 18, 2020.

### The Biased Investigation of Jane Roe's Complaint Against John

116.    On November 5, 2020, Jane Roe filed a Title IX complaint ("Complaint") against John alleging that John engaged in violations of the Policy.

117.    Jane Roe alleged that John had raped her on the night of October 31, 2020, when she was incapacitated.

118.    Upon information and belief, Defendant Hebson never conducted an initial meeting with John to notify him of Jane Roe's complaint and the alleged policy violations in issue.

119.    Defendant Hebson assigned Defendant Kruntorad as the Title IX Investigator to investigate the allegations of the Complaint.

120.    In clear violation of their Policy, Defendants did not provide John with a written notice of the allegations made against him by Jane Roe before John was interviewed.

121.    On November 9, 2020, Defendant Kruntorad emailed John stating that she was a Title IX investigator, that she received a report about John, and that she needed to meet with John.

122.    Defendant Kruntorad met with John to take his statement on November 13, 2020. She interviewed John before interviewing Jane Roe.

123.    Defendant Kruntorad never advised John of the specifics of Jane Roe's allegations against him aside from a claim that John raped Jane Roe.

124.    John responded to Defendant Kruntorad's questions to the best of his ability.

17

125.    Defendant Kruntorad met with Jane Roe to take her statement on November 18, 2020.

126.    Upon information and belief, Jane Roe told Defendant Kruntorad that she was drugged at the Party and could not consent to the sexual interaction with John.

127.    Based on her interview with Jane Roe, Defendant Kruntorad noted that only twelve minutes passed between the time Jane Roe arrived at the Party and the time she was at the Friend's Apartment texting Witness #2.

128.    Jane Roe told Defendant Kruntorad that when John got her a drink at the party, John's back was to her and she "could not see what was being put in it."

129.    Jane Roe told Defendant Kruntorad that she started to feel "fuzzy" when walking to the Friend's Apartment with John.

130.    Upon information and belief, prior to leading the investigation of the Complaint, Defendant Kruntorad received little to no training about conducting unbiased and impartial Title IX investigations.

131.    During her interview of Jane Roe, Defendant Kruntorad can be heard stating, "I still think, regardless, you couldn't give consent," revealing her bias against John.

132.    During her interview of Jane Roe, Defendant Kruntorad admitted that Jane Roe's complaint against John was her first Title IX investigation.

133.    Upon information and belief, Defendant Kruntorad lacked the experience necessary to conduct a Title IX investigation on her own in accordance with the Policy.

134.    Defendant Kruntorad failed to question Jane Roe about whether Jane Roe consumed any alcoholic beverages prior to the Party.

18

135.    Defendant Kruntorad never questioned Jane Roe about whether she obtained hickeys from sexual activity on another night, as was suggested in the Title IX Investigative Report by Witness #1.

136.    At no point during her investigation did Defendant Kruntorad establish a timeline of events for the evening of October 31, 2020.

137.    Defendant Kruntorad never conducted follow-up interviews with Jane Roe or John during the course of the investigation.

138.    According to the Investigation Report, Defendant Kruntorad's investigation spanned November 9, 2020, to November 19, 2020, a mere ten days.

139.    On December 8, 2020, Jane Roe and John received a copy of the Defendant Kruntorad's preliminary Investigation Report.

140.    Jane Roe responded to the Investigation Report with a comment expressly stating that she believed she was drugged by John and that she never got physically sick from excess alcohol.

141.    Jane Roe was critical of unidentified Witness #3 who expressed disbelief that she was drugged, and Defendant Kruntorad did not follow up with Witness #3.

142.    John submitted a response to the Investigative Report.

143.    The Investigation Report found Jane Roe more credible than John because she had "several witnesses who attested to her incapacitation."

144.    The Investigation Report summarized John's interview in five bullet points, while summarizing Jane Roe's testimony in twelve bullet points.

19

145.   The Investigation Report contained highly prejudicial hearsay statements purportedly made by law enforcement about John's alleged attack of Jane and John's suspected prior sexual history.

146.   The Investigation Report contained highly prejudicial and inflammatory statements about John's mental health.

147.   A revised Investigation Report was issued on or about January 4, 2021.

148.   The Investigation Report found John to be less credible than Jane Roe based on statements that John made about immaterial facts.

149.   The Investigation Report found that Jane Roe was credible.

150.   John submitted evidence about his ADHD and PDD-NOS, which is high functioning autism.  This evidence was submitted to explain John's rigid communication style. Defendants excluded this evidence.

151.   On February 8, 2021, the day evidence closed, Defendant Kruntorad interviewed Witness #7.

152.   Witness #7, Jane Roe's Resident Assistant, told Defendant Kruntorad that Jane Roe texted her stating that she was drugged and sexually assaulted on Halloween night.

**John Lodged Various Objections to the Title IX Process**

153.   Throughout the Title IX investigation, John expressed various concerns to Defendant Hebson about the Title IX process applied to his case.

154.   On February 10, 2021, John contested the jurisdiction of SU over Jane Roe's complaint since the alleged sexual assault took place at an off-campus apartment with no relation to an education program or activity.

20

155.    John questioned the incompleteness and lack of impartiality of Defendant Kruntorad's investigation.

156.    On February 23, 2021, John wrote Defendant Hebson to express concern about material deficiencies in Defendant Kruntorad's investigation; namely; Defendant Kruntorad did not make efforts to uncover exculpatory evidence on the following topics: (1) whether Jane Roe was under the influence of drugs and/or alcohol before she arrived at the Party; (2) the sources of Jane Roe's hickeys since Witness #3 reported that Jane Roe's sister (Witness #1) stated that Jane Roe may have received the hickeys on a prior evening; (3) whether Jane Roe told Witness #2 that she consented to sex with John, as reported by Witness #3; (4) whether Jane Roe filed the Title IX complaint against John to gain advantage in her prior request to SU for alternative housing; and (5) whether John could obtain a copy of the medical reports relied upon by Jane Roe.

157.    John also expressed concern about the Investigative Report containing prejudicial commentary by Witness #7, who said that John raped other women the night of the Party.

158.    On February 24, 2021, John requested the full names of all witnesses interviewed in the investigation because the Investigation Report did not include witness names, he asked to review the photographs of Jane Roe's alleged injuries, and he requested access to Jane Roe's medical and/or Crisis Center records that were discussed within the Title IX report.

159.    Defendant Hebson refused to provide the names of the witnesses interviewed by Defendant Kruntorad, and he ignored John's other questions outlined in his February 24th email.

160.    On February 25, 2021, John objected to the inclusion of the recordings in the materials to be provided to the Title IX Hearing panel for the reason that the Investigation Report

did not identify who made each of the five recordings or identify the names of the speakers heard on the recording.

161.     John submitted a report by Dr. Lee Burdette Williams.  The report discussed autism and its impact on John's communication style and actions the night of October 31, 2020.

162.     On February 26, 2021, John requested that the interview summaries of witnesses who would not be testifying at the hearing be redacted from the investigative report.  Since John would not have the opportunity to cross-examine these witnesses, he had concerns about the Hearing Panel reviewing their interview summaries.

163.     John also requested that any and all reference statements purportedly made by law enforcement and statements made by a sexual assault nurse examiner regarding Jane Roe's alleged injuries be redacted from the investigative report since he would not have the ability to question these witnesses.

164.     Defendant Hebson responded to John's February 26th email by stating that "decisions related to presented information will be decided upon at the hearing" and that the campus process does not provide for pre-hearing determinations about evidence.

**John's Title IX Hearing**

165.     On March 2, 2021, SU convened a Title IX Hearing Panel to adjudicate the Complaint (the "Hearing").

166.     Prior to the Hearing, over John's objection, the Title IX Hearing Panel received an un-redacted copy of the Title IX Investigation Report that contained the investigative interviews of seven unidentified witnesses.

22

167.     The Title IX Hearing Panel was able to review interview summaries of witnesses who did not testify at the hearing and submit to cross-examination.

168.     At the Hearing, for the first time, Jane Roe claimed that she consumed alcohol prior to arriving at the Party.

169.     Jane Roe confirmed that Defendant Kruntorad never asked her if she consumed drugs or alcohol prior to arriving at the Party.

170.     At the hearing, for the first time, Jane Roe suggested that her incapacitation was the result of drinking too much alcohol, rather than being drugged by John.

171.     The Title IX Hearing Panel refused to hear testimony from John's witness Lee Burdette Williams.

172.     The Title IX Hearing Panel was able to review within the Title IX Investigation Report highly prejudicial statements purportedly made by law enforcement, as well as read about Jane Roe's alleged injuries identified by a Sexual Assault Nurse Examiner (SANE) Examination/Crisis Evaluation.

173.     Jane Roe never provided any medical documentation or police reports.

174.     The Hearing did not conclude on March 2nd.  The Hearing resumed on March 16, 2021.

175.     On March 16th, Jane Roe's sister (Witness #1) testified about purported statements made by law enforcement about John and purported injuries that Jane Roe sustained.

176.     Jane Roe's sister (Witness #1) also testified that Jane Roe passed out and had no pulse at times outside of the Party.

23

177.    Although Jane Roe purportedly did not have a pulse, Jane Roe's sister (Witness #1) did not call 911 or seek emergency medical attention for Jane Roe.

178.    The Title IX Hearing Panel failed to consider or include relevant evidence related to John's defense of the allegations.

179.    The Title IX Hearing Panel limited John's ability to provide a closing statement.

180.    On March 29, 2021, the Title IX Hearing Panel issued a Title IX Review Panel Notice of Determination finding John responsible for engaging in prohibited conduct under the Policy.

181.    The Title IX Hearing Panel imposed on John a sanction of suspension for five years until May 2026.

182.    In its Notice of Determination, the Title IX Hearing Panel cited Jane Roe's testimony that she consumed alcohol before the Party.

183.    The Title IX Hearing Panel found that Jane Roe's ability to consent to intercourse with John was impaired by alcohol consumption.

### John Appealed the Hearing Outcome

184.    On April 5, 2021, John submitted a Notice of Appeal of the Title IX Hearing Panel's Notice of Determination to Defendant Hebson, setting forth various grounds for his appeal, including (i) newly discovered evidence, (ii) a biased, impartial, and prejudicial investigation process, and (iii) several procedural irregularities (the "Notice of Appeal").

185.    John's Notice of Appeal included a letter dated March 31, 2021, from Doug Moore, M.D. Dr. Moore opined that many of Jane Roe's claims were not medically supportable; to wit, that she could not pass out and then awaken and be able to text or have lucid conversations with

24

other students, and that Jane's explanation about bruising on her chest could be attributed to prior trauma to the skin.

186.    Defendant Hebson verified receipt of the appeal on April 6, 2021.

187.    On May 20, 2021, the Title IX Appeal Panel submitted its "Title IX Appeal Panel Notice of Decision" (the "Appeal Decision"), dismissing John's appeal.

188.    In its Appeal Decision, the Title IX Appeal Panel conceded that there were procedural irregularities during the investigation process that were inconsistent with the Policy, largely attributing these to "inexperience" and "adjustment" to a new policy.

189.    The Appeal Decision did not address why Dr. Moore's report did not rise to the level that would affect the outcome of the matter.

190.    The Appeal Decision determined that the testimony of Dr. Lee Burdette Williams was not relevant but failed to explain the basis of this determination.

191.    The Appeal Decision acknowledged that the Hearing Panel received a copy of the full Title IX Investigative Report but found that those statements were not considered by the Hearing Panel.

**CLAIM ONE**
**Violation of Title IX - Erroneous Outcome**
**(Against Samford University)**

192.    John restates and re-avers each and every allegation in the preceding paragraphs as if fully restated herein.

193.    Title IX, 20 U.S.C. §§ 1681 *et seq.*, provides, in relevant part, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits

of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

194.    SU is an education program or activity operated by receipt of Federal financial assistance.

195.    Title IX is enforceable through an implied right of action affording an individual discriminated against due to his or her gender pecuniary damages and equitable relief.

196.    Title IX may be violated by an institution of higher education's imposition of discipline where gender is a motivating factor in the decision to discipline.

197.    SU committed unlawful gender bias against John in the investigation and adjudication of Jane's accusations.

198.    Defendant Hebson never conducted an initial meeting with John to discuss his rights under the Policy.

199.    John never received proper notice of the date, time and allegations lodged by Jane Roe prior to being interviewed by SU.

200.    An erroneous outcome occurred in John's case because he was found responsible for violating SU's Policy, and gender bias was a motivating factor in the decision.

201.    The procedural errors made in John's case resulted in the erroneous outcome based on a flawed and distorted conception of the facts.

202.    Defendants failed to conduct an adequate, reliable and impartial investigation, and there is an articulable doubt as to the accuracy of the outcome of the investigation and subsequent hearing. Specifically, SU conducted procedures in a manner biased against John and in favor of Jane Roe's version of events, based on the following events:

26

a.  Defendants never asked Jane Roe if she consumed any alcohol or drugs prior to arriving at the party.

b.  Defendant Kruntorad can be heard stating in her interview with Jane Roe: "I still think regardless, you couldn't give consent."

c.  Defendants never asked Jane Roe if she had hickeys or bruising on her chest from another source.

d.  Defendants never asked Jane Roe to produce medical documentation to support her allegation that John slipped a drug into her drink.

e.  Defendants did not establish a timeline of events for the evening of October 31, 2020.

f.  Defendants never asked Jane Roe how she could change from feeling and appearing sober when she arrived at the Party to being incapacitated in less than twelve minutes.

g.  Defendants never asked Jane Roe how she was able to text, dress herself after sexual intercourse with John, walk back to the Party, and inform friends that she was sexually assaulted if she were incapacitated.

h.  The Title IX Investigation Report summarized John's interview in five bullet points, while summarizing Jane Roe's testimony in twelve bullet points.

i.  The Title IX Investigation Report contained highly prejudicial hearsay statements (and sometimes hearsay within hearsay statements), allegedly made by law enforcement about John's attack of Jane and John's suspected prior sexual history.

27

j.   The Title IX Investigation Report contained highly prejudicial and inflammatory statements about John's mental health.

k.   Defendants refused to include in the Title IX Investigation Report evidence about John having ADHD and autism.

l.   The Title IX Investigation Report concluded that Jane Roe was more credible than John despite substantial gaps and inconsistencies in her statements.

m.   The Title IX Investigation Report and the Title IX Hearing Panel ignored major inconsistencies in Jane Roe's statements about drinking alcohol, and her belief that she was drugged by John.

n.   The Title IX Hearing Panel ignored Jane Roe's earlier written response to the Title IX Investigation Report that she was drugged and that she did not consume excess alcohol.

o.   The Title IX Hearing Panel was allowed to receive the entire Title IX Investigative Report even though only Jane Roe's sister (Witness #1), testified at the hearing.

203.   Upon information and belief, SU also failed to train its investigators, including Defendant Kruntorad, on the statutory requirements for Title IX investigations and adjudications.

204.   SU also refused to provide John the identity of all witnesses listed in the Investigation Report or documentation regarding various highly inflammatory statements about Jane Roe's SANE examination, an ongoing police investigation, or otherwise.

205.   SU also ignored evidence supporting John's version of events and defense of the false allegations against him and imposed a sanction on him that is likely to severely and irreparably harm him for life.

28

206.     In addition, SU's recent initiatives to curb sexual assault on its campus, along with its fear of public criticism and SU representative's statements in the media and campus newsletters which resulted in or from these initiatives, show a plausible inference of gender bias.

207.     This further suggests that gender bias was, in fact, a motivating factor in SU's erroneous finding against John.

208.     Defendants SU and the SU officials involved, including Defendant Kruntorad and Defendant Hebson, appear simply to have chosen to believe Jane Roe because she is a woman and to disbelieve John because of his sex was a motivating factor in finding him responsible.

209.     As a direct and proximate result of Defendants' conduct, John sustained tremendous damages, including, but not limited to, loss of education and career opportunities, emotional distress, economic injuries and other direct and consequential damages.

### CLAIM TWO
**Violation of Title IX – Selective Enforcement**
**(Against Samford University)**

210.     John restates and re-avers each and every allegation in the preceding paragraphs as if fully restated herein.

211.     In addition to providing for a private cause of action under a theory of erroneous outcome, Title IX also provides for a private cause of action under a theory of selective enforcement.

212.     In this case, John was not treated as favorably as a female would be treated in a Title IX investigation.

213.     Although John was innocent of the Title IX allegations levied against him, the severity of the penalty of a five-year suspension alone was directly attributable to anti-male bias.

29

214.    Under the Policy, an exceptionally wide range of potential sanctions could be imposed against John, ranging from the least severe sanction, training or mere disciplinary warnings to the most severe sanctions of suspension and expulsion.

215.    Under the Policy, the Title IX Hearing Panel has full discretion in imposing sanctions "as necessary to end the misconduct, prevent its recurrence, and address its effects." *See* Ex. A at p. 37.

216.    Under the Policy, the Title IX Hearing Panel must include a rationale for the sanctions imposed. *Id.* at p. 39.

217.    SU failed to include its rationale for imposing a five-year suspension in the Title IX Hearing Panel's Notice of Determination.

218.    A five-year suspension is, in effect, no different than an expulsion as the typical educational career of a student is four years.

219.    Since John is a senior, he cannot complete his degree at another educational institution without redoing two extra years.

220.    Further, upon review of SU's Clery statistics it appears that there have been at least seven reported rapes and nine reported cases of fondling.

221.    Upon information and belief, the accused students were all males.

222.    Upon information and belief, the males were treated differently than a female would be treated if accused of a similar offense.

223.    As a direct and proximate result of Defendants' conduct, John sustained tremendous damages, including, but not limited to, loss of education and career opportunities, emotional distress, economic injuries and other direct and consequential damages.

## CLAIM THREE
### Breach of Contract
### (Against Samford University)

224.    John restates and re-avers each and every allegation in the preceding paragraphs as if fully restated herein.

225.    The relationship between a private university and its students is contractual and includes the school's policies relating to disciplinary proceedings. In determining whether a private university breached any provision of its educational contract, a court will determine whether the university's actions met the expectations of a reasonable person.

226.    The Title IX Policy is a binding contract between John and SU.

227.    SU offered enrollment to John, and he accepted that offer and paid SU tuition.

228.    John satisfied all of the obligations required by SU to remain in good standing, and he enrolled at SU with the understanding and reasonable expectation that SU would act fairly, impartially and abide by the terms of the Title IX Policy.

229.    John satisfied all of the obligations required by SU to remain in good standing, and he enrolled at SU with the understanding and reasonable expectation that SU would fulfill its contractual obligations to him and that he would graduate with a diploma upon completing all academic requirements.

230.    SU materially breached its contractual obligations to John under the Title IX Policy, including, but not limited to, by:

- Failing to adequately train its Title IX investigators or adjudicators to conduct unbiased and impartial Title IX proceedings;

31

- Failing to conduct an initial meeting with John advising him of Jane Roe's complaint and the alleged Policy violations;

- Failing to provide John with written notice of the allegations, prior to his interview, that described the conduct allegedly constituting Sexual Misconduct, and the date and location of the alleged incident.

- Failing to assess and consider the evidence in John's proceeding in an unbiased and impartial manner, including granting Jane Roe greater credibility because she is a woman;

- Failing to conduct an unbiased and impartial Title IX investigation;

- Failing to question Jane Roe on her consumption of alcohol and/or drugs before the party due to her inexperience as a Title IX investigator;

- Failing to timely adjudicate and/or accept John's objection to the introduction of the unredacted Title IX Investigation Report;

- Rejecting John's request for Dr. Lee Burdette Williams to testify at the hearing;

- Finding Jane Roe met the burden of preponderance of the evidence.

- Failing to include any rationale or findings for imposing the severe sanction of suspension for five years despite the Policy requirement that the Notice of Determination contain such explanation; and/or

- Making findings of fact that had no basis in the record as well as making biased and pretextual credibility determinations.

- Failing to provide sufficient information for the rationale stated in the Title IX Appeal Panel Notice of Determination.

4851-1818-5966, v. 5

- Failing to identify in the Appeal Decision the procedural irregularities during the course of the investigation that were not consistent with the Policy so that John could assess whether the Policy deviation was material to the findings and sanctions against him.

231.   As a direct and foreseeable consequence of the above material breaches of contract by Defendants, John sustained damages, including, without limitation, loss of education and career opportunities, economic injuries, and other direct and consequential damages.

232.   As a result, John is entitled to recover damages in an amount to be determined at trial, plus pre and post judgment interest and attorney fees and costs.

### CLAIM FOUR
**Breach of the Covenant of Good Faith and Fair Dealing**
**(Against Samford University)**

233.   John restates and re-avers each and every allegation in the preceding paragraphs as if fully restated herein.

234.   John and SU had a contractual relationship that was earmarked by, *inter alia,* an imbalance of bargaining power and significant trust and confidence shared by the parties.

235.   Thus, John and SU had a special relationship from which a duty of good faith and fair dealing arose on the part of SU.

236.   John, on the one hand, fulfilled all contractual obligations owed by him.

237.   Instead of acting in good faith, SU, on the other hand, breached its duty of good faith and fair dealing as outlined herein, including by failing to follow the Policy, wrongfully finding John responsible for violating the Policy, and denying his appeal, all of which could only have occurred in bad faith.

4851-1818-5966, v. 5

238.   By engaging in this conduct, SU (by way of its representatives, including Defendants Kruntorad and Hebson) breached its implied duty of good faith.

239.   As a direct and proximate result of SU's actions and omissions, John has suffered and is entitled to compensatory and punitive damages in an amount to be determined at trial, but that accounts for all emotional distress that he has suffered, plus prejudgment interests, attorney fees, and costs.

**CLAIM FIVE**
**Negligence**
**(Against All Defendants)**

240.   John restates and re-avers each and every allegation in the preceding paragraphs as if fully restated herein.

241.   Defendants owed John a legal duty to ensure that John received a fair and impartial hearing process.  Samford was on notice at the hearing that Jane Roe's testimony and theory of why she was incapacitated was completely inconsistent with her insinuations and her other supportive witness statements, including recordings, stated during her interviews; yet, failed to call into question in the findings of responsibility that Jane Roe shifted her theory because her prior theory that John drugged her was untrue and unsupported by evidence (despite the fact that Jane had a prior blood draw to prove that she was drugged).

242.   Based on what was described above, the wrongful finding was reasonably foreseeable that John could be wrongfully found responsible.

243.   Samford breached its duty to John when it permitted a finding of responsibility to occur.

34

244.    John sustained significant damages as a direct and proximate result of Defendants' breach, including but not limited to a five year suspension from Samford.

245.    As a result, John has suffered and is entitled to compensatory and punitive damages in an amount to be determined at trial, but that accounts for all emotional distress that he has suffered, plus prejudgment interest, attorney fees, and costs.

**WHEREFORE,** John respectfully requests that this Court:

(A)    Issue a declaration that SU's process was unlawful as applied to John;

(B)    Enter preliminary and permanent injunctive relief that vacates the decision of SU to suspend John for at least five years and that removes from his academic record all references to the decision and any other related sanctions or disciplinary actions;

(C)    Award compensatory and punitive damages in an amount to be determined at trial, but that accounts for all emotional distress suffered by John;

(D)    Award court costs and other reasonable expenses incurred in maintaining this action, including attorney fees; and

(E)    Award such other relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully demands a trial by jury pursuant to Fed. R. Civ. P. 39.

/s/ *Brett H. Knight*_____
Brett H. Knight

35

Dated:  June 25, 2021

Respectfully Submitted,

/s/ *Brett H. Knight*

Brett H. Knight

Of Counsel:
JAFFE, HANLE, WHISONANT & KNIGHT, P.C.
2320 Arlington Ave. South
Birmingham, AL 35205
P: (205) 930-9800
F: (205) 930-9809
E: bknight@rjaffelaw.com

Of Counsel:
Susan C. Stone
Kristina W. Supler
KOHRMAN JACKSON & KRANTZ, LLP
1375 E. 9th Street, 29th Floor
Cleveland, OH 44114
P: (216) 696-8700
F: (216) 621-6536
E: scs@kjk.com; kws@kjk.com
*Motion to Admit Pro Hac Vice pending*

*Counsel for Plaintiff John Doe*

36