FILED
2021 Jun-25  PM 01:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| JOHN DOE, | ) | CASE NO. |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| SAMFORD UNIVERSITY; MALLORY | ) | |
| KRUNTORAD; and TIM S. HEBSON, Ed.D., | ) | |
| | ) | |
| Defendants. | ) | |

## MOTION FOR DECLARATORY JUDGMENT, PRELIMINARY AND PERMANENT INJUNCTION

Pursuant to Fed. R. Civ. P. 65(a), Plaintiff John Doe ("John") respectfully requests that this Honorable Court issue a preliminary injunction against Defendants Samford University ("Samford") and its employees Defendant Mallory Kruntorad ("Kruntorad") and Defendant Tim Hebson ("Hebson") (collectively, Samford, Kruntorad, and Hebson are hereinafter referred to as the "Defendants"), and who, at all times, were implementing the policies and procedures of Samford when it unlawfully suspended John, a senior, for a period of no less than five years. John requests that this Court enter an order granting him declaratory and injunctive relief that will declare the discipline imposed upon him as unlawful and allow him to return to Samford and complete his courses to earn his degree. Additionally, he would request that all references regarding the suspension be removed from his academic record.

## I.    INTRODUCTION

This case arises from false and later shifting theories of sexual misconduct alleged by student Jane Roe ("Jane") against John, and the flawed and gender biased process that ensued after Jane reported her allegations to Samford. John, a former student at Samford with senior status, was diagnosed with autism (then called PDD-NOS) in 2016. John's condition makes it very difficult

for John to socialize with peers, especially when it comes to engaging with the opposite sex. Being socially awkward, John discovered that he could mix fun cocktails and bring them to parties to break the ice and engage his peers, which is where John's academic career took a wrong turn.

John met Jane at a Halloween party. Compl. at ¶ 79. After exchanging pleasantries, John poured a drink for Jane, and the two students mutually decided to find a quieter place to converse with each other. They went to another apartment and engaged in sexual activity. *Id.* at ¶¶ 82, 91-98. When John and Jane returned to the Halloween party, students verbally accosted John and accused him of drugging Jane. *Id.* at ¶ 108. The entire investigation and subsequent Investigation Report focused on one issue: did John place a drug in Jane's drink? Indeed, as pleaded in the Complaint, Jane was adamant in her written response to the Investigation Report she was drugged and that she never got physically sick from alcohol. *Id.* at ¶ 140. It was not until the hearing that Jane shifted her story to "he should have known that I was too drunk to consent to sexual activity." Upon information and belief, Jane changed her story because she simply could not prove that she was drugged by John. Sadly, Defendants accepted Jane's narrative and ushered John out of Samford.

As stated in Plaintiff's Complaint and discussed herein, John was subject to a disciplinary process that was confusing, rushed, and predetermined to find John responsible, regardless of the promises set forth in the Samford University Sexual Misconduct Policy ("Policy") and his rights under Title IX of the Education Amendments Act of 1972 ("Title IX") to be investigated and adjudicated without gender bias or discrimination. Samford denied John those basic rights resulting in John's five-year suspension and an academic record that marks him as a sexual predator.

## II.    **FACTUAL BACKGROUND**

John hereby incorporates by reference the facts and definitions as set forth in the Complaint filed contemporaneously with this Motion. The investigation was based on the allegation that John engaged in non-consensual sexual intercourse with Jane on the evening of October 31, 2020. Defendants' investigation, which was flawed and partial, concluded that Jane was incapacitated due to alcohol and therefore, unable to give consent. The Title IX investigator's inexperience, paired with Defendants' procedural errors and gender bias caused John substantial, immediate, and continuing harm.

### A. The Party

John brought pitchers of seasonal mixed drinks to a party at a nearby apartment complex at around 9:30 p.m. Compl. at ¶¶ 70-73. John mixed one pitcher from a recipe that he found on Pinterest called "Pumpkin Juice," which, at most, was approximately seven percent (7%) alcohol, as it contained soda, juice, and a large can of pureed pumpkin. *Id.* At this party, John met, and conversed with Jane, who had consumed some of the "Pumpkin Juice." *Id.* at ¶¶ 79-81. Jane appeared sober to John when he spoke with her at the party, and John was happy to have Jane interested in getting to know him, as John was naïve in his interactions with women. Eventually, the two mutually agreed to go to a quieter place (i.e., the Friend's Apartment) to continue their conversation. *Id.* at ¶ 82. As described in the Complaint, only twelve (12) minutes passed from the time that John met Jane and when they left the party for the Friend's Apartment together. *Id.* at ¶ 86.

After the two entered the Friend's Apartment, they continued to talk on the couch. *Id.* at ¶¶ 87-88. Eventually, Jane asked John if he wanted to hook up. *Id.* at ¶ 90. John asked Jane for consent to have sexual intercourse. *Id.* at ¶ 92. Jane gave John consent, and the two entered the bedroom of the apartment. *Id.*

The entire sexual interaction between John and Jane was brief. After which, Jane got up from the bed, got dressed, and left the apartment. *Id.* at ¶ 99. Jane travelled downstairs and went back to the Halloween party. *Id.* Sometime after she went back to the party, Jane texted friends to come get her; she sent at least one friend the location of where she was so that the friend could find her. *Id.* at ¶ 103. Jane also started accusing John of having sex with her while she was incapacitated. *Id.* at ¶ 101. Somehow, Jane must have communicated that John drugged her because students confronted John at the party and asked him what he put in the drink. *Id.* at ¶¶ 107-09. John, whose autism shapes the way he communicates with others, told those students who were confronting him, that he put "everything" in the drink. *Id.* However, John was referring to the literal fact that he put the ingredients in the drink, not understanding that it could be misconstrued against him.

After the party and after alleging that she was going in and out of consciousness, Jane reported false claims to Samford, presenting statements and recordings from friends accusing John of placing a drug in the drink that John had mixed and served at the party.

## B. The Investigation and Hearing

Hebson, as Samford's Student Conduct and Title IX Coordinator, delegated the investigation to Kruntorad. This matter was Kruntorad's first Title IX investigation, and her actions during the investigation clearly showed lack of proper training and/or constituted deviations from the Policy. *Id.* at ¶ 132. First, on November 13, 2020, Kruntorad interviewed John without issuing a proper notice of charges to him or making sure that John had attended an initial meeting with Hebson. *Id.* at ¶ 118, 120-223. John had no knowledge of the date or details of Jane's allegations before he was asked to give a statement to Samford. *Id.* On November 18, 2020, Kruntorad interviewed Jane. *Id.* at ¶ 125. Jane told Kruntorad that John had his back to her when he made the

drink, and she could not see what was being put in it, insinuating that John must have put a drug in the drink that he handed to Jane. *Id.* at ¶ 128. Jane also said she began to feel fuzzy when she walked to the other apartment. *Id.* at ¶ 129.

Second, Kruntorad did not ask Jane important questions during her interview. For example, Kruntorad failed to question Jane on whether she drank alcohol or consumed drugs prior to attending the party, or even if she had taken prescription drugs before drinking alcohol. *Id.* at ¶ 134. Kruntorad also failed to question Jane as to why she believed John put something in her drink or whether other students who drank from the same pitcher had also reacted similarly to the drink. Upon information and belief, Krunotard never interviewed other witnesses to see if Jane was intoxicated when she arrived at the party or, whether anyone asked her if she was okay when she left the party to go with John to the Friend's Apartment. Likewise, Kruntorad learned that Jane had submitted to a rape kit after her sexual encounter with John but did not ask for any of the results of the rape kit.

Third, Kruntorad prepared a report that failed to identify the names of the witnesses. Each witness was only assigned a number by which he or she was referenced throughout the Investigation Report. Also, for some unexplained reason, on February 8, 2021, which is the day that the evidence closed, Krunotard interviewed Jane's resident assistant, referenced in the Investigation Report as Witness #7. *Id.* at ¶ 151-52. Witness #7 told Krunotard that on February 2, 2021, Jane texted her and told her that she left campus late last semester because she was drugged and sexually assaulted on Halloween night. *Id*. Upon information and belief, no follow-up questions to Jane or other witnesses occurred after this important interview of Witness #7. Likewise, during this same interview, Witness #7 made a highly prejudicial statement, indicating that Jane told her that John had raped other women on the night of the Halloween party. No one

4821-6538-3151, v. 2

pressed Witness #7 for more information, questioned Jane about her inflammatory statement, allowed John to defend such an aspersion, or deleted the statement from the Investigation Report. Instead, the investigation closed with many open questions. Further, Defendants' entire investigation lasted only a mere ten days, and the report was so conclusory in nature that it was difficult for John to have sufficient details to prepare for the subsequent hearing. *Id.* at ¶ 138.

Nevertheless, John tried to mount a defense. John made several requests for exculpatory evidence, and he lodged various objections to the Title IX process on record. On December 8, 2020, John and Jane both received a copy of the Title IX Investigation Report, which not only failed to provide the identity of witnesses, but also included highly prejudicial, hearsay statements made by unidentified police officials and medical providers (which Jane and/or her witnesses presented to Kruntorad during the investigation) that could not be questioned or verified by John. *Id.* at ¶¶ 139, 145-46. Yet later, the evidence John attempted to submit about his autism diagnosis and its effect on his response to peers was not included in the Investigation Report. *Id.* at ¶ 150 Inexplicably, and after John had given a statement without the benefit of knowing what he was accused of doing, John received a Title IX notice letter.

John also lodged several objections to the Title IX process. His objections ranged from contesting whether Samford had jurisdiction under the new Title IX regulations to investigate the case to concerns that Kruntorad made no effort to ask Jane important questions during Jane's interview or uncover exculpatory evidence. *Id.* at ¶¶ 153-64. John's objections essentially went unaddressed. *Id.* at ¶¶ 164, 166.

John fared no better at his hearing that occurred on March 2, 2021. The Hearing Panel received the full Title IX Investigative Report, even though Jane only had one other witness, Jane's sister, testify at the hearing. *Id.* at ¶ 172. Moreover, Jane's testimony shifted in theory: Jane made

no mention that she believed that John might have drugged the drink he gave her. *Id.* at ¶ 170. Rather, Jane presented testimony that she drank alcohol in the car with her friends before arriving at the party and that she simply was too drunk to consent to sexual intercourse. *Id.* at ¶¶ 168-70. Even though the entire focus of the investigation was on John drugging Jane and then luring her to another apartment to have sex with her, Jane's narrative shifted. At the hearing, Jane blamed John for not realizing – in the twelve (12) minutes they had known each other – that she was too drunk to consent to sexual activity. Further, the Title IX Hearing Panel did not question or consider Jane's change in testimony, and at the same time, prevented John from introducing evidence to support his defense of the allegations, including an expert report by Lee Burdette Williams, an expert on autism, to explain why John would have made several statements to other students when confronted by them after Jane made allegations of rape. *Id.* at ¶¶ 171, 178.

Nevertheless, and despite all of this, the Title IX Hearing Panel found John responsible for violations of the Policy and "suspended" him for five years – which, in a college student's career, is the functional equivalent of expulsion. The Title IX Hearing Panel attributed Jane's incapacitation to her drinking too much before the party – facts that were never provided to John in the Investigation Report. The Title IX Review Panel Notice of Determination sanctioned John without sufficient analysis.

John thereafter filed a timely appeal. *Id.* at ¶¶ 184-85. He provided new evidence and argued that the sanction was excessive. *Id.* He also provided a letter from a physician noting that many of Jane's claims during the hearing were medically impossible. *Id.* Without any surprise, the appeal was denied, although the Title IX Appeal Panel Notice of Decision conceded that there were procedural irregularities. *Id.* at ¶ 188. Yet, Samford did not describe these irregularities or provide further detail. The five-year suspension was upheld.

4821-6538-3151, v. 2

With no remaining option, and his reputation and academic career at stake, John seeks relief from this Court. He now moves for injunctive relief and respectfully asks this Court to vacate his five-year suspension, allow him to return to Samford to complete the requirements for his degree, and remove any reference to the discipline from his academic record.

## III.    LAW AND ARGUMENT

John meets the basic framework for a preliminary injunction because he can show: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction were not granted, (3) that the threatened injury to the plaintiff outweighs the harm an injunction may cause the defendant, and (4) that granting the injunction would not disserve the public interest." *SunTrust Bank v. Houghton Mifflin Co.*, 268 F. 3d 1257, 1265 (11th Cir. 2001) (*quoting Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 1407, 1410 (11th Cir. 1998). As demonstrated below, Plaintiff has met all the factors and this Court should issue the requested preliminary injunction. [1]

### A.  John Has a Substantial Likelihood of Success on the Merits.

### 1.  Title IX

Title IX provides that no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any education program receiving Federal financial assistance. 20 U.S.C. § 1681. Courts, including those in the Eleventh Circuit, have recognized that Title IX has found a private right of action for individuals to enforce the mandates of the statute. *See Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282,1293

---

[1] Although Rule 65 generally requires a bond for the issuance of a preliminary injunction, the bond should be waived in this case.  Because there would be no harm to Samford if an injunction is issued, and due to the inability of the Plaintiff to pay the bond given that he is a college student, the bond requirement should be waived.  See *Bellsouth Telecomm., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005) (holding that district court acted within its discretion when it did not require a bond).

4821-6538-3151, v. 2

(11th Cir. 2007).  Under Title IX, the Eleventh Circuit has recognized two theories through which a Title IX claim may be proved: erroneous outcome and selective enforcement. *Doe v. Lynn Univ., Inc.*, No. 9:16-cv-80850, 2017 U.S. Dist. LEXIS 7528, at * 12 (S.D. Fla. Jan 19, 2017).  John is substantially likely to succeed upon each of these theories.

### a.  Erroneous Outcome

To prevail on an erroneous outcome claim, a plaintiff must show that "he was innocent and wrongly found to have committed an offense" and that "there is a causal connection between the flawed outcome and gender bias." *Doe v. Valencia Coll.,* 903 F.3d 1220 (11th Cir. 2018), *citing Yusuf v. Vassar Coll.,* 35 F.3d 709 (2nd Cir. 1994).  Further, to state a plausible Erroneous Outcome claim, Plaintiff must allege: (1) "particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding;" and (2) "a particularized allegation relating to a causal connection between the flawed outcome and gender bias," i.e., "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Doe v. Rollins Coll*., 352 F. Supp. 3d 1205, 1209 (M.D. Fla. 2019). Further, plaintiffs must allege facts that support a "plausible inference of bias and causation – for instance, 'statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender.' *Id*., *citing Doe v. Columbia Univ.*, 831 F.3d 46, 57-59 (2d Cir. 2016) (finding allegations that university and Title IX investigator faced mounting pressure from public criticism regarding its handling of sexual-assault investigations sufficient to support inference of gender bias).

### i.  Defendants' recent practices evidence a clear gender bias towards males.

Samford's report of Campus Crime Statistics, as required by The Clery Act, shows a total of 15 rape offenses and 18 fondling offenses in either on-campus residences or other on-campus

properties     at     Samford     between     2017     and     2019.     *See*
https://www.samford.edu/departments/files/Public_Safety/Three-Year-Crime-Statistics.pdf.
Presumably in response to this alarming number reported offenses, especially in light of the small
student body at Samford (Samford has just over 5,000 students), Defendants have instituted
various campaigns and initiatives aimed at preventing sexual assault on campus. These same
campaigns and initiatives show a fear of criticism and a stark preference towards victims of sexual
assault. *See* Compl. at ¶¶ 32-33.

Recently, Samford partnered with University of Alabama-Birmingham in an event to
support the "It's On Us" campaign. According to a news article about the campaign, "every 21
hours there is a rape on an American college campus. One in 12 college-age men admit having
fulfilled     the     prevailing     definition     of     rape     or     attempted     rape..."     *See*
https://www.uab.edu/studentmedia/kaleidoscope/news/473-usga-kicks-off-the-it-s-on-us-
initiative. The news article also notes various resources for victims of sexual assault only.
Moreover, a news article in Samford's newspaper, the Samford Crimson, reported that Samford's
Title IX Office participated in showing a film to its student body called "Nevertheless," a
documentary that raises awareness about sexual harassment in today's society. In connection with
the showing of this film, Samford's wellness coordinator stated, "[t]his is a national, if not
worldwide, problem that has been normalized and dismissed in incredibly detrimental and
dehumanizing ways.... As a Christian university, I belief Samford has an extra responsibility to
talk about the uncomfortable things that work to erode our sense of... mutual respect..." *See*
https://www.thesamfordcrimson.com/2021/04/20/nevertheless-film-and-panel-preview/.     The
article also includes a graphic including a statistic that 1 of every 6 women has been the victim of
rape or attempted rape. *Id.* With this statistic, as well as its participation in these campaigns and

the related external pressures of maintaining a safe campus environment, it is clear that Samford

is fearful of any allegations of sexual misconduct on its campus – a fear that ultimately resulted in

the favoritism of an accusing female (i.e., Jane) over an accused male (i.e., John).

In addition, and perhaps most telling of Defendants' stark bias towards accusing females,

like Jane, is an article in the Inside Samford Magazine Fall 2019 edition, wherein Samford publicly

announced to its matriculation, professors, and staff the following statement:

> Once Prohibited Conduct [as the term is defined in the Policy] is reported, the Title
> IX Coordinator will conduct an initial assessment ***in which the well-being of the
> complainant is paramount***.

*https://issuu.com/samford_university/docs/2019-20_marketing_inside_su_august_final-single-pa* (emphasis added). Although Samford must be objective and neutral during a Title

IX investigation, in accordance with federal regulations, Samford obviously gives great

preference to the well-being of a complainant, without any mention of the well-being of

the respondent. This announcement by Samford's administration is the exact kind of

"statement by a pertinent university official," as contemplated by the *Rollins and Yusuf*

cases, *supra*, that shows the influence of gender on Samford's Title IX investigation and

procedures and the increased likelihood of a predetermined outcome. Here, because of this

gender bias, Defendants' entire proceeding was slanted towards believing Jane, as the

alleged victim, rather than uncovering the truth.

ii.   **Defendants rushed the Title IX investigation in order to suspend John.**

Under Samford's own Policy, the investigation phase can last up to forty-five (45) calendar

days. *See* Policy, at p. 24. Here, the investigation phase lasted no longer than ten (10) calendar

days.   The brevity in this investigation is best evidenced by the Investigation Report, where Kruntorad summarized Complainant's interview in twelve (12) bullet points and Respondent's interview in five (5) bullet points. This terseness makes sense in light of Kruntorad's statement in her interview with Jane, noting that this matter is her first investigation and that she believed that Jane "couldn't give consent." Compl. ¶ 131. Kruntorad's presumptive conclusions, which were, per the Policy, reviewed by the Title IX Coordinator, Hebson, show a lack of any ability or desire to conduct a thorough and impartial investigation.

In fact, this matter is no different than the United States Department of Education, Office for Civil Rights' ("OCR") response to the investigation of Wesley College for violations of Title IX.  *See In re Letter to Wesley College*, Oct. 12, 2016.  In that case, OCR reprimanded Wesley College for several Title IX violations, one of which was conducting an investigation in just seven days. OCR found that the college violated Title IX by failing to conduct an equitable investigation of the matter. Just like *Wesley* violated Title IX in rushing an investigation, Samford too has violated John's rights by moving with haste in the investigation.

### iii.   Defendants exhibited gender bias against John in the investigative process which led to an erroneous outcome.

Defendants never conducted an initial meeting with John to explain to him his rights under the Policy, nor did Defendants provide to John a detailed written notice of the date of the alleged incident and a description of the facts that would constitute a violation of the Policy.  Instead, on November 13, 2020, Krunotard met with John for an interview without providing any written notice of the allegations lodged against him by Jane. Compl. ¶¶ 122-23. John was, at the outset, at a distinct disadvantage in that he was forced to answer questions in a vacuum absent any knowledge of the particular allegations made against him and without any ability to prepare a defense.

Then, on November 18, 2020, five (5) days later, Krunotard met with Jane to interview her for the first time. As a result, Jane had the opportunity to respond to John's answers and statements made during his interview and eventually shift her theory of her case. In *Doe v. Brandeis Univ.,* the court found that a lack of specific notice prejudiced the accused student in that it had an adverse effect on the student's ability to prepare a defense. 177 F. Supp. 3d at 602. Just like in the *Brandeis* case, Defendants' Investigation Report found Jane more credible since she supposedly presented more consistent statements regarding the incident. *Id.* Moreover, like the accused student in the *Brandeis* case, John was found to be inconsistent in his recollection of events, which would be expected where one party is fully informed of the subject matter "and the other remains ignorant and has to surmise the specifics of the charges over the course of the investigation." *Id.*

Here, the situation is far worse than the circumstances in the *Brandeis* matter. Not only was John interviewed prior to having an initial meeting or receiving a notice letter, but Jane never committed to one set of facts and was allowed to shift theories throughout the Title IX process. First, Jane did not have to commit to a statement which would form the basis of a charge letter. Second, Jane was interviewed after John, giving her a clear advantage. And third, which would turn out to be most devastating to John, Jane shifted theories on the day of the hearing. Instead of claiming that she was drugged, Jane – probably because she had no evidence of being drugged – stated for the first time that she drank before arriving at the party and that she was too incapacitated to consent to sexual activity. A proper charge letter at the beginning of the case would have made this about-face less problematic to Jane, thereby impairing her ability to prove her case against John.

      **iv.**    **Defendants exhibited gender bias by failing to uncover exculpatory evidence during the Title IX investigation.**

Samford violated Title IX under the erroneous outcome theory by failing to uncover exculpatory evidence.  It has been established under the new Title IX regulations, enacted on August 14, 2020, that recipient institutions have an obligation under Title IX to uncover both inculpatory and exculpatory evidence. *See* 34 C.F.R. § 106.45 (b)(5)(vi), which provides that both parties should have the opportunity to review any evidence that is part of the investigation. In addition, colleges are obligated to undertake a "thorough search for relevant facts and evidence pertaining to a particular case…" *See* 85 Fed. Reg. at 30, 292.  Indeed, even prior to the new regulations, in the matter of *Doe v. Amherst,* 238 F.Supp. 3d 195, * 217, 2017 U.S. Dis LEXIS 28237, *46, the *Amherst* court held that the college failed to conduct a fair investigation because it failed to uncover potentially exculpatory text messages in the same manner that it pursued inculpatory evidence.

Similarly, here, Defendants did not pursue exculpatory information. Kruntorad failed to ask Jane pertinent questions, while simultaneously impeaching John for insignificant variations in his statement. Kruntorad further failed to ask Jane about any prior alcohol or drug use before the party or whether she had marks or hickeys on her chest before to arriving at the party.  At one point, Jane also reported that she had her blood drawn, presumably to see if she had been drugged by John, but she was not asked to produce the results of the blood analysis for the Title IX investigation. Kruntorad engaged in similar lack of probing with Witness #3 who indicated that Witness #1 told him that Jane Roe was on the wild side and had hickeys. There is no indication that Witness # 1 was ever asked when she saw Jane's hickeys and/or where the hickeys were located on Jane. The investigation was flawed, and significant exculpatory evidence was ignored.

> **v.   Defendants reached an erroneous outcome because Jane's testimony at the hearing should not have been deemed credible in light of her statements during her interview and written follow-up response to the Investigation Report.**

The erroneous outcome theory under Title IX is analyzed at length in *Doe v. Oberlin College*, 963 F.3d 580 (6th Cir. 2020). In *Oberlin*, the Sixth Circuit Court of Appeals concluded that the plaintiff sufficiently alleged an erroneous outcome based upon "clear procedural irregularities" and the "grave" doubt on the accuracy of the disciplinary proceeding outcome. *Id.* at 586-88. Here, it is impossible for the hearing outcome to be accurate when Jane's credibility was never called into question by the Title IX Hearing Panel for not informing Kruntorad (during her interview or subsequent response) that she had consumed a great deal of alcohol prior to arriving at the party. Jane's only excuse at the hearing for not providing this information was that Kruntorad did not ask her whether she drank alcohol prior to arriving at the party.  However, this weak explanation makes no sense when coupled with Jane's statements to Kruntorad, claiming that she never got physically sick from an excess of alcohol. Against those very words, the Title IX Hearing Panel concluded that the Jane's ability to give clear permission to have intercourse with Respondent was impaired by her alcohol consumption. Absolutely no mention of drugging was made in the Notice of Determination.  Further, the fact that Hebson did not call into question this finding can only be explained by gender bias, as it is a miscarriage of justice when Jane's hearing testimony is compared to multiple oral and written statements made to Kruntorad.

A policy violation was not established by a preponderance of the evidence standard, and the outcome was erroneous.

> vi. **Defendants exhibited gender bias against John by exercising jurisdiction over Jane's claims against John even though Title IX does not apply to off-campus conduct that does not involve an educational program or activity.**

On February 26, 2020, John presented several objections to Hebson.  His first objection was to request dismissal of the case given that the new Title IX regulations do not apply to off-

campus conduct that does not involve an educational program or activity. *See* 34 C.F.R. §106.44(a). The alleged conduct took place at an off-campus party that had absolutely no connection to an educational program or activity. Just because the parties are both students does not mean that there is a connection to Samford. The educational program or activity must involve an activity in which the recipient exercised substantial control over both the respondent and the context in which the harassment occurred. *Id.* Based on this language, Hebson should have issued a mandatory dismissal of Jane's complaint. The outcome was erroneous in that it should never have occurred at all.

### b. Selective Enforcement

To state a selective enforcement claim, a plaintiff must allege sufficient facts to permit the plausible inference that "a similarly situated member of the opposite sex was treated more favorably than the plaintiff due to his or her gender." See *Doe v. Cummins,* 662 F. App'x 437, 452 (6th Cir. 2016); *see also Rollins Coll.*, 2020 U.S. Dist. LEXIS 249437, at *2 (M.D. Fl. July 13, 2020).

In this case, Samford's favoritism of Jane is readily apparent. During the investigation, and heard on a recording presented with the evidence, Krunotard told Jane that she could not have consented despite the fact that the investigation had not yet been completed. Compl. at ¶ 131. Samford additionally allowed Jane's highly inflammatory and/or hearsay statements about what the police stated during their independent investigation, Jane's agreement to a SANE examination, and about John's actions that supposedly inferred guilt to be included in the Investigation Report.

On the other hand, John was not allowed to introduce evidence of his autism diagnosis or the expert report of Lee Burdette Williams. Compl. at ¶¶ 161, 171. This evidence would have been helpful in explaining John's awkward communication style with peers, especially in response to

16

stress. Later, in the Appeal, Defendants did not accept or comment on the medical report submitted by Doug Moore, M.D., which shed light on the medical impossibility of many statements contained in the Investigation Report and during the Hearing.

Finally, Defendants did not rule on a single objection lodged by John prior to the hearing. As stated in the Complaint, on February 26, 2021, Hebson emailed John and told him that decisions related to presented information will be decided upon at the hearing and that the campus process does not provide for pre-hearing determinations about evidence. *Id.* at ¶ 164. However, the Title IX Hearing Panel did not squarely address any of John's prior objections. To this day, John does not know the identity of witnesses in the report. To this day, Defendants never gave a rationale as to how it even had jurisdiction over this case. And, to this day, because Defendants never asked Jane about prior drug and alcohol use, the witnesses who were present with Jane when she consumed alcohol prior to the party were never questioned.

A review of Clery statistics show that there have been several rapes on campus the past few years. Upon information and belief, the statistics refer to males. Responses to expedited discovery are bound to reveal sanctions against males.

## 2. Breach of Contract

John is also likely to succeed on his breach of contract claim. To prove a breach of contract under Alabama law, a plaintiff must prove: (1) a valid contract binding the parties; (2) plaintiff's performance under the contract; (3) the defendant's non-performance; and (4) resulting damages. *Dupree v. Peoples South Bank*, 308 So. 3d 484 (Ala. 2020).

First, it is undisputed that John and Samford were party to a valid contract. Alabama courts have generally noted that there is a contractual relationship between a student a private college. *See Craig v. Forest Inst. of Prof'l Psychology*, 713 So. 2d 967 (Ala. Civ. App. 1997) (recognizing

4821-6538-3151, v. 2

that there is a basic legal relation between a student and a private university or college that is contractual in nature, and the catalogues, bulletins, circulars, and/or regulations of the institution made available to the matriculant become a part of such contract); *see also, Southwell v. University of Incarnate Word*, 974 S.W. 2d 351, 356 (Tex. App. 1998) ("[W]here a private college or university impliedly agrees to provide educational opportunity and confer the appropriate degree in consideration for a student's agreement to successfully complete degree requirements, abide by university guidelines, and pay tuition, a contract exists.").

Second, John performed his own obligations under the parties' contract; John has successfully completed nearly all of the credits he needs to graduate and also paid tuition, which was accepted by Samford.

Third, Defendants breached the contract in at least six ways, among others, as described in the Complaint. Specifically, the University: (i) failed to provide a fair and impartial complaint resolution process that treats the parties equitably, in violation of Section VIII A.; (ii) did not meet the burden of gathering evidence sufficient to reach a determination regarding responsibility that falls on the University and not the parties, in violation of Section VIII B.; (iii) found John responsible even though the preponderance of the evidence standard was not met, in violation of Section L.2 (c) (iv) failed to provide John with proper written notice of the allegations, in violation of Section VIII.F and IX. E; (v) failed to conduct an initial meeting between Respondent and Title IX Coordinator, in violation of Section IX. F. and (vi) denied John's appeal even though he met the requisite standard, in violation of Section X. *See* Compl. at Exh. 1.

Finally, John's damages are nothing short of significant. Explained in further detail below, John is at risk of losing educational and employment opportunities, in addition to the substantial reputational harm he faces having been wrongfully suspended for sexual misconduct. Because

4821-6538-3151, v. 2

John's damages are directly attributable to Defendants' breaches, John is substantially likely to succeed on this claim.

### 3. Breach of Implied Covenant of Good Faith and Fair Dealing

Alabama recognizes that every contract carries an implied obligations of good faith and fair dealing, which has been defined as "an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract." *Lloyd Noland Found., Inc., v. City of Fairfield Healthcare Auth.,* 837 So.2d 253, 267 (Ala. 2002) (quoting *Seller v. Head,* 261 Ala. 212,217, 73 So.2d 747, 751 (1957). Samford's failure to abide by the contract frustrated John's ability to defend himself.

John was kept in the dark as to the exact nature of charges until the process was well underway. Hebson never conducted an initial meeting to notify John of the complaint and the alleged policy violations. Likewise, Hebson never explained to John the rights and resources that were available to him, including the importance of preservation of evidence. Just like that meeting never occurred, John never received a written notice of the conduct allegedly constituting sexual misconduct, and the date and location of the alleged incident. John had to guess about the accusations before he was interviewed and did not have the opportunity to review the allegations with his advisor to prepare a defense.

### 4. Negligence

Alabama also recognizes a state law claim for negligence. Under Alabama law, a claim of negligence requires a plaintiff to produce evidence of the following elements: (1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury. *S.B. v. Saint James Sch.*, 959 So. 2d 72 (Ala. 2006). Here, the facts show that Defendants breached

4821-6538-3151, v. 2

their legal duty to John, a foreseeable plaintiff. Per the policies in place at the university, Samford was obligated to provide John with a fair investigative process, which it did not do. Indeed, Defendants, *inter alia,* failed to provide proper notice of the allegations to John, failed to question Jane on her shifting narratives throughout the Title IX investigation (and simultaneously failing to question Jane's credibility), failed to consider John's evidence to support his defense of the allegations, failed to conduct an unbiased and impartial Title IX investigation, failed to investigate both inculpatory and exculpatory evidence, and failed to provide a rationale for its sanctions – all of which constitutes a breach of Defendants' duty because they violated John's rights under federal and state law as well as under the institutional policies. Moreover, in suspending John due to Jane's non-credible and false claims of sexual misconduct, Defendants proximately and directly caused harm to John. Explained in more detail below, John's reputation and academic and employment prospects have been imminently threatened by Defendants' breach of duty.

Accordingly, because Defendants breached a legal duty that they owed to John, and because John was harmed as a proximate result of such actions, John is likely to prevail on this claim.

**B.  John Will Suffer Irreparable Harm Absent Injunctive Relief**

Unless this Court grants John injunctive relief, John is certain to suffer irreparable harm. To demonstrate irreparable harm, a plaintiff must show that he or she is likely to suffer harm for which there is no adequate remedy at law. *Winter v. Natural Res. Def. Counsil, Inc.*, 555 U.S. 7, 20 (2008). A lost opportunity to continue with post-secondary education, coupled with the possibility that a student may be unable to pursue meaningful educational opportunities elsewhere while his name remains associated with sexual misconduct, inevitably affects professional prospects and cannot be compensated with money damages. *See Plummer v. Univ.*

*of Houston*, 860 F.3d 767 at fn. 10 (5th Cir. 2017) (Judge Edith Jones, dissenting), *citing Doe v. Rector & Visitors of George Mason Univ.*, 149 F. Supp. 3d 602, 622(E.D. Va. Feb. 25, 2016). Moreover, "[c]ertainly stigmatization as a sex offender can be a harsh consequence for an individual who has not been convicted of any crime, and who was not afforded the procedural protections of criminal proceedings." *Plummer* at fn. 10, *citing Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 602 (D. Mass. Mar. 31, 2016) ("If a college student is to be marked for life as a sexual predator, it is reasonable to require that he be provided a fair opportunity to defend himself and an impartial arbiter to make that decision.").

Following a biased and impartial investigation along with numerous procedural irregularities, the Title IX Hearing Panel sanctioned John, a student with senior status and a single semester left before graduation, to a suspension of five (5) years and a related permanent notation in his academic file. Compl. at ¶ 181. Samford thereafter upheld the suspension on appeal. *Id.* at ¶ 187. Although there were other less stringent sanctions Samford (and the Title IX Hearing Panel) could have imposed, including, but not limited to, warnings, interventions, restriction of some or all programs or activities, and/or lesser suspensions, they opted to impose one of the harshest sanctions available under the Policy – despite Jane's inconsistencies in her story and her less than credible testimony at the Hearing. John's unjustified suspension, which is effectively an expulsion due to the exorbitant length of time, therefore precludes his ability to complete his one remaining semester of school. Further, transferring would require not only additional tuition, but also significant time and effort as John would be forced to make up non-transferrable credits that the transferring university would not accept. John may also be required to provide a reason for his transfer for the single semester, which would force him to disclose his academic record and the

21

current disciplinary findings related to sexual misconduct. As a result, John's life is essentially on hold for the next five years as he waits to complete his final semester of school.

Moreover, even if John is able to conclude his academic career at Samford, any potential future employer will also receive his academic record with the disciplinary finding and notation to sexual misconduct. To assume that every, or even most, employers will give John the opportunity to explain himself along with the sexual misconduct reference is willful ignorance. Unfortunately, John's career may be over before it even starts because of Defendants' implicit trust in Jane's story and their complete disregard of John's rights under Title IX and the Policy. This very real danger, in which John now finds himself, cannot be compensated with monetary damages and constitutes irreparable harm.

Denying John injunctive relief will also permit John's reputational harm to persist. Samford suspended John and bestowed the label of sexual misconduct offender upon him while simultaneously violating federal and state law. Courts have recognized that the stigma so associated with such a mark is significant. *See Plummer* at fn. 10, *citing Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 602 (D. Mass. Mar. 31, 2016).

Accordingly, granting John preliminary injunctive relief is the only way to preserve John's academic and professional opportunities as well as his reputation.

## C.  **The Balance of Hardships Favors John**

The balance of hardships dramatically favors John in this case. An order vacating Samford's sanction and removal of the sanction from John's academic record will not harm Defendants more than John absent injunctive relief. As described, John is facing irreparable injury

to his academic career, potential employment opportunities, and his reputation. John's ability to complete his college degree and earn a future livelihood is severely compromised, perhaps forever, before his professional career even starts. On the other hand, no great hardship would be imposed on Samford by John's return to complete his degree, as John only wishes to complete his remaining credits of his final semester and earn his degree. In fact, John can complete his degree remotely off-campus if Samford agrees to such an accommodation. John has invested years of his life in his education, as well as substantial financial resources, and only wants to obtain his college degree. Samford will face no great hardship in permitting a student, who it had little to no evidence to suspend, to pay tuition and receive his degree. Accordingly, the balance of equities lies strongly in John's favor.

### D.   <u>The Public Interest is Best Served by Granting Injunctive Relief</u>

Finally, and without question, the public has an interest in ensuring that educational institutions follow proper procedure. The public interest is further served "by vindicating a legal interest that Congress has determined to be an important one." *Cohen v. Brown Univ.*, 809 F. Supp. 978, 1001 (D.C. R.I. Dec. 22, 1992); *see also Favia v. Indiana Univ. of Pa.*, 812 F. Supp. 578, 585 (W.D. Pa. Nov. 2, 1992) ("The public has a strong interest in the prevention of any violation of constitutional rights.").

The public has a clear interest in ensuring that Samford's disciplinary process comports with the standards provided to students under Title IX and that an individual's reputation is not baselessly degraded due to false allegations of sexual misconduct. In contrast, the public interest promoted by permitting a school to enforce its policies does not rise to the same level where the school's policies fall far short of federal requirements or where, as here, the policies are not followed by the institution. The public interest is best served by granting John injunctive relief.

## IV.    CONCLUSION

John is at risk of irreparable harm and has met the criteria for preliminary injunctive relief. For the aforementioned reasons, John respectfully requests that this Motion for Preliminary Injunction be granted, such that his suspension is vacated, he may return to school to complete his final academic semester, and all references to the disciplinary process and sanction are removed from John's academic record.

Respectfully Submitted,


/s/ *Brett H. Knight*
Brett H. Knight

Of Counsel:
JAFFE, HANLE, WHISONANT & KNIGHT, P.C.
2320 Arlington Ave. South
Birmingham, AL 35205
P: (205) 930-9800
F: (205) 930-9809
E: bknight@rjaffelaw.com

Of Counsel:
Susan C. Stone
Kristina W. Supler
KOHRMAN JACKSON & KRANTZ, LLP
1375 E. 9th Street, 29th Floor
Cleveland, OH 44114
P: (216) 696-8700
F: (216) 621-6536
E: scs@kjk.com; kws@kjk.com
*Motion to Admit Pro Hac Vice pending*

*Counsel for Plaintiff John Doe*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing Motion for Declaratory Judgment, Preliminary and Permanent Injunction was filed electronically on this the 25th day of June 2021. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties not receiving service through the Court's electronic filing system will be served by regular U.S. mail.  Parties may access this filing through the Court's system.

/s/ *Brett H. Knight*
Brett H. Knight
