

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| **JOHN DOE,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | **2:21-cv-00871-ACA** |
| | ] | |
| **SAMFORD UNIVERSITY, et al.,** | ] | |
| | ] | |
| **Defendants.** | ] | |

## <u>MEMORANDUM OPINION</u>

Before the court is Defendants Samford University, Mallory Kruntorad, and Tim Hebson's motion to dismiss the complaint.  (Doc. 12).

Non-party Jane Roe filed a complaint with Samford against Plaintiff John Doe, alleging that he raped her at an off-campus college party.  Through its employees Ms. Kruntorad and Mr. Hebson, Samford investigated and held a hearing on the complaint.  Based on a panel's finding that John Doe was responsible for sexual misconduct, Samford imposed a five-year suspension on John Doe.  John Doe now sues Samford for sex discrimination, in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, breach of contract, and breach of the covenant of good faith and fair dealing.  (Doc. 1 at 25–34).  He also sues Samford, Mr. Hebson, and Ms. Kruntorad for negligence.  (*Id.* at 34).  He seeks monetary damages, a preliminary injunction, a permanent injunction, and a

declaratory judgment.  (*Id.* at 35; Doc. 4).  Defendants have moved to dismiss the complaint for failure to state a claim.[1]  (Doc. 12).

John Doe has not alleged facts that support a reasonable inference that Samford was biased against him on the basis of his sex, and so the court **WILL GRANT** the motion to dismiss and **WILL DISMISS** the two federal claims for violation of Title IX **WITHOUT PREJUDICE**.  Because the court will dismiss the only federal claims in this case, the court **DECLINES** to exercise supplemental jurisdiction over the state law claims, and **WILL DISMISS** those claims **WITHOUT PREJUDICE** for lack of subject matter jurisdiction.

## I.   BACKGROUND

At this stage, the court must accept as true the factual allegations in the complaint and construe them in the light most favorable to the plaintiff.  *Butler v. Sheriff of Palm Beach Cnty.*, 685 F.3d 1261, 1265 (11th Cir. 2012).  The court may also consider documents a plaintiff attaches to a complaint.  *See Hoefling v. City of Miami*, 811 F.3d 1271, 1277 (11th Cir. 2016) ("A district court can generally consider exhibits attached to a complaint in ruling on a motion to dismiss . . . .").  John Doe attaches Samford's sexual misconduct policy to his complaint (doc. 1-1), so the court's description of the facts will include that policy.

---

[1] Defendants also moved to dismiss the claims against Samford and Ms. Kruntorad for insufficient process and insufficient service of process.  (Doc. 12 at 2–3).  After Defendants filed the motion to dismiss, John Doe corrected service on Samford and Ms. Kruntorad, so that request to dismiss is moot.

On October 31, 2020, John Doe, a senior at Samford, attended a Halloween party at a friend's off-campus apartment. (Doc. 1 at 1 ¶ 1, 2 ¶ 4, 13 ¶ 70). Jane Roe, a freshman who had already consumed alcohol earlier that evening, also attended the party. (*Id.* at 13 ¶¶ 74, 76). Jane Roe, who was not visibly intoxicated, approached John Doe, complimented him on a drink he had prepared for the party, and mentioned how loud the party was. (*Id.* at 14 ¶¶ 80, 83). John Doe suggested going to another friend's apartment where it was quieter, and Jane Roe agreed. (*Id.* at 14 ¶¶ 82, 84). Twelve minutes passed between Jane Roe's arrival at the party and arrival at the friend's apartment. (*Id.* at 14 ¶ 86).

At the apartment, Jane Roe texted a friend—"Witness #2"—to say that she had left the party with John Doe, then asked John Doe if he wanted to "hook up." (Doc. 1 at 14 ¶ 89, 15 ¶ 90). After confirming Jane Roe's consent several times, Jane Roe and John Doe had sex. (*Id.* at 15 ¶ 92). Jane Roe then dressed herself, left the apartment, and went back to the party, where she told Witness #2 that John Doe had assaulted her. (*Id.* at 15 ¶ 99, 16 ¶ 101). When John Doe returned to the party, other partygoers confronted him about the accusation. (*Id.* at 16 ¶¶ 108, 110). Jane Roe's sister took her back to a dorm and took photos of injuries Jane Roe alleged she sustained during the sexual assault, including hickeys. (*Id.* at 16 ¶ 111–13).

The next day, Jane Roe filed a police report against John Doe, at which time the police drew her blood to test for the presence of drugs. (Doc. 1 at 17 ¶ 114).

There is no indication in the complaint about what that blood test revealed. On November 5, 2020, Jane Roe filed a Title IX complaint against John Doe, alleging that he raped her while she was incapacitated. (*Id.* at 17 ¶ 116).

Samford's sexual misconduct policy defines sexual assault as "any actual or attempted sexual contact using any object with another person without that person's consent." (Doc. 1-1 at 7). A person "incapacitated by alcohol or drug consumption (whether voluntarily or involuntarily) . . . is considered unable to give consent to sexual activity." (*Id.* at 10). Someone who has experienced any "prohibited conduct" under the policy may file a formal complaint, which begins the complaint resolution process. (*Id.* at 26).

Once the school's Title IX Coordinator receives a formal complaint, he has ten days to review the complaint and provide initial notice of the allegations to the parties. (Doc. 1-1 at 27). The written notice must include, among other things, "[n]otice of the allegations, including the identities of the parties involved in the incident(s), if known, the conduct allegedly constituting Sexual Misconduct, and the date and location of the alleged incident, if known." (*Id.*). The Title IX Coordinator must also attempt to schedule an initial meeting with the respondent, and "[p]rior to or during the initial meeting," the Title IX Coordinator must notify the respondent of, among other things, the complaint and the alleged policy violations. (*Id.*).

After initial review and notice to the respondent, the Title IX Coordinator will designate an investigator "who is free of conflict of interest or bias." (Doc. 1-1 at 29). The investigator will "typically" interview the complainant, the respondent, and witnesses. (*Id.* at 29). Samford's sexual misconduct policy provides that "[t]he respondent is presumed not responsible until a determination regarding responsibility is made at the conclusion of the complaint resolution process." (*Id.* at 22).

The complaint against John Doe did not follow these provisions precisely. The Title IX Coordinator, Defendant Tim Hebson, did not provide written notification or arrange an initial meeting with John Doe, but instead appointed Defendant Mallory Kruntorad as the investigator. (Doc. 1 at 17 ¶¶ 118–20). Ms. Kruntorad had "received little to no training about conducting unbiased and impartial Title IX investigations." (*Id.* at 18 ¶ 130). This was Ms. Kruntorad's first Title IX investigation. (*Id.* at 18 ¶ 131).

Ms. Kruntorad emailed John Doe that she needed to meet with him about a report that had been filed against him. (Doc. 1 at 17 ¶¶ 118–21). They met on November 13, 2020. (*Id.* at 17 ¶ 122). The timing is not clear, but either before or at that meeting, Ms. Kruntorad told John Doe that Jane Roe had alleged he raped her, without providing any other specifics. (*Id.* at 17 ¶ 123).

A week later, Ms. Kruntorad met with Jane Roe to take her statement.  (Doc. 1 at 18 ¶ 125).  Jane Roe told Ms. Kruntorad that she could not have consented to sex with John Doe because she was drugged.  (*Id.* at 18 ¶ 126).  She stated that John Doe had prepared her a drink with his back turned to her, so that she could not see what he put in it, and that as she was walking to the friend's apartment, she started feeling "fuzzy."  (*Id.* at 18 ¶¶ 128–29).  Ms. Kruntorad did not question Jane Roe about whether she had drunk any alcohol before going to the party or whether she had gotten hickeys from sexual activity on another night.  (*Id.* at 18–19 ¶¶ 134–35, 23 ¶ 169).  At some point during the interview, Ms. Kruntorad told Jane Roe that "I still think, regardless, you couldn't give consent."  (*Id.* at 18 ¶ 131).  Ms. Kruntorad also interviewed at least seven other witnesses.  (*See id.* at 22 ¶ 166).

On December 8, 2020, Jane Roe and John Doe each received copies of Ms. Kruntorad's investigation report.  (Doc. 1 at 19 ¶ 139).  Ms. Kruntorad's report included summaries of interviews with seven witnesses, and recordings of five of those interviews.  (Doc. 1 at 21–22 ¶ 160, ¶ 166).  John Doe does not describe what each of those witnesses stated, but does mention some statements included in the report.  For instance, Witness #3, who was at the party (*see id.* at 16 ¶ 107) gave Ms. Kruntorad information casting doubt on Jane Roe's story.  Witness #3 stated that she did not believe that Jane Roe was drugged, told Ms. Kruntorad that Jane Roe's sister stated Jane Roe may have received hickeys on an earlier night, and

reported that Jane Roe told another witness that she consented to sex with John Doe. (*Id.* at 19 ¶ 141, 21 ¶ 156).

The report also contained statements from Witness #7, Jane Roe's resident assistant, who stated that Jane Roe had texted her stating that she was drugged and sexually assaulted on Halloween.  (Doc. 1 at 20 ¶ 152).  Witness #7 also told Ms. Kruntorad that John Doe had raped other women that night.  (*Id.* at 21 ¶ 157). The report also recounted hearsay statements made by law enforcement about the alleged attack and John Doe's "suspected prior sexual history."  (*Id.* at 20 ¶ 145). Finally, the report summarized John Doe's interview in five bullet points and Jane Roe's interview in twelve bullet points, and concluded that Jane Roe was more credible because several witnesses "attested to her incapacitation."  (Doc. 1 at 19 ¶ 143–44).

Samford's sexual misconduct policy allows each party to review the report and provide a written response with clarifications, identification of information that should have been included in the report, and other concerns about the evidence. (Doc. 1-1 at 32).  Jane Roe provided a written response stating that she believed John Doe drugged her and criticizing Witness #3's statement.  (Doc. 1 at 19 ¶¶ 140–41). John Doe also submitted a response, but the complaint does not recount what his response contained.  (*Id.* at 19 ¶ 142).  Ms. Kruntorad issued a revised investigation

report in January 2021, still finding John Doe less credible than Jane Roe.  (*Id.* at 20 ¶¶ 147–49).

In February, John Doe wrote to the Title IX Coordinator, Mr. Hebson, and expressed concern that Ms. Kruntorad had not attempted to learn exculpatory evidence about whether (1) Jane Roe was already under the influence when she arrived at the party, (2) someone else gave Jane Roe the hickeys; (3) Jane Roe had told a witness that she consented to sex with John Doe; and (4) Jane Roe was attempting to use the Title IX complaint to obtain alternative housing.  (Doc. 1 at 21 ¶ 156).  He also sought a copy of Jane Roe's medical reports, the identities of all the witnesses, access to the photographs of Jane Roe's injuries, and access to her Crisis Center records.  (*Id.* at ¶ 156, ¶ 158).  Mr. Hebson refused to identify the witnesses and ignored John Doe's other concerns and requests.  (*Id.* at 21 ¶ 159).

Before the Title IX hearing, John Doe attempted to introduce a medical report about his autism and its effect on his communication style.  (Doc. 1 at 22 ¶ 161).  He also sought to exclude the written interview summaries of any witnesses who would not be testifying at the hearing, as well as statements made by law enforcement and a report by a sexual assault nurse examiner, based on his inability to cross-examine those witnesses.  (*Id.* at 22 ¶¶ 162–63).  Mr. Hebson responded only that evidentiary decisions would be decided at the hearing.  (*Id.* at 22 ¶ 164).

Under Samford's sexual misconduct policy, once the investigation is complete, the Title IX Coordinator will designate a Title IX Hearing Panel, which will conduct a "prompt, equitable and live hearing and make a determination regarding responsibility and, if appropriate, sanctions." (Doc. 1-1 at 34). At the hearing, each party's advisor may question the other party and any witnesses. (*Id.* at 35). The respondent is presumed not responsible for the violation and the Panel may find a respondent responsible only based on a preponderance of the evidence. (*Id.* at 34, 36).

The hearing began on March 2, 2021. (Doc. 1 at 22 ¶ 165). Although many of the witnesses did not testify in person, the Title IX Hearing Panel received the unredacted interviews with all seven witnesses. (*Id.* at 22–23 ¶¶ 166–67). Jane Roe did testify and claimed, for the first time, that she was incapacitated because of consuming too much alcohol, instead of being drugged. (*Id.* at 23 ¶ 170). She did not provide the Panel with any medical documentation or police reports, but the Panel did review law enforcement's "highly prejudicial statements" and the sexual assault nurse examiner's description of Jane Roe's injuries. (*Id.* at 23 ¶ 172). The Panel refused to hear testimony from John Doe's medical expert about the effect of his autism on his style of communication. (*Id.* at 23 ¶ 171).

The hearing continued on March 16, 2021. (Doc. 1 at 23 ¶ 174). That day, Witness #1 testified about statements law enforcement made about John Doe and

about injuries she claimed Jane Roe sustained.  (*Id.* at 23 ¶ 175).  She also testified that Jane Roe passed out outside the party, at times having no pulse.  (*Id.* at 23 ¶ 176).  Other than Jane Roe and Witness #1, no other witness testified.  (*See id.* at 28 ¶ o).  The Title IX Hearing Panel found John Doe responsible for engaging in prohibited conduct because Jane Roe's ability to consent to sex was impaired by alcohol consumption.  (*Id.* at 24 ¶¶ 180, 183).  The Panel issued a five-year suspension for John Doe.  (*Id.* at 24 ¶¶ 181).

Samford's sexual misconduct policy provides that a party may appeal the decision regarding responsibility on several grounds, including that the Title IX Coordinator, the investigator, or a Panel member had a conflict of interest or was biased.  (Doc. 1-1 at 40).  John Doe appealed the Title IX Hearing Panel's decision on grounds of a biased investigation, procedural irregularities, and newly discovered evidence.  (Doc. 1 at 24 ¶ 184).  The newly discovered evidence was a doctor's opinion that Jane Roe's claims about passing out were not medically supportable because she could not pass out and then be able to text or carry on lucid conversations and that other sources could have caused the bruising she claimed John Doe inflicted.  (*Id.* at 24–25 ¶ 185).  The Title IX Appeal Panel conceded that procedural irregularities inconsistent with the policy occurred, but concluded that those irregularities were due to "inexperience" and "adjustment" to a new policy and therefore dismissed his appeal.  (*Id.* at 25 ¶ 188).

In addition to the irregularities in the investigation, John Doe now points to several other pieces of evidence to show that Samford's process was biased.  First, a Fall 2019 edition of Inside Samford Magazine stated: "Once Prohibited Conduct is reported the Title IX Coordinator will conduct an initial assessment in which the well-being of the complainant is paramount."  (Doc. 1 at 7 ¶ 31).  Second, Samford has engaged in the "It's on Us Initiative," which states that "every 21 hours there is a rape on an American college campus."  (*Id.* at 7 ¶ 32).  Third, while John Doe's case was pending, the Title IX office showed a documentary called "Nevertheless," which was about sexual assault.  (*Id.* at 7 ¶ 34).

John Doe's complaint also refers to Samford's report disclosing statistics for reported crimes.   (Doc. 1 at 30  ¶ 220).   That report can be located at https://www.samford.edu/departments/files/Public_Safety/Three-Year-Crime-Statistics.pdf (last checked August 11, 2021) (the "Clery Report").  Because the complaint refers to the report, the report is central to his claim of sex discrimination, and no one disputes the authenticity of the report, the court may consider the report without converting the motion to dismiss into one for summary judgment.  *See Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002).

The Clery Report "provides statistics of crimes reported to [Samford's Department of Public Safety and Emergency Management], local law enforcement agencies, and Campus Security Authorities."  Clery Report at 1.  The most recent

report available covers the years 2017 to 2019 and lists only crimes reported to have occurred on campus.  *Id.*  The report does not speak to the sex of the person reporting the offense, the sex of the person accused of the offense, whether any school disciplinary proceedings occurred as a result of the report, or what the result of the school disciplinary proceedings was.  *See generally* Clery Report.  But John Doe alleges that "the accused students were all males."  (Doc. 1 at 30 ¶ 221).

## II.   DISCUSSION

John Doe asserts four claims against Samford alone, and one claim against Samford, Ms. Kruntorad, and Mr. Hebson.  The first two claims allege that Samford violated Title IX by discriminating against him based on his sex.  (Doc. 1 at 25–30).  The remaining three are state law claims for breach of contract, breach of the covenant of good faith and fair dealing, and negligence.  (*Id.* at 31–35).  Defendants move to dismiss all of the claims.  (Doc. 12).

"To survive a motion to dismiss, the plaintiff must plead 'a claim to relief that is plausible on its face.'"  *Butler*, 685 F.3d at 1265 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  This standard "does not require detailed factual allegations, but it demands   more   than   an   unadorned,   the-defendant-unlawfully-harmed-me

accusation." *Id.* (quotation marks omitted). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (quotation marks and alteration omitted). In other words, the court must accept all of the plaintiff's factual allegations, but must disregard "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts." *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1246 (11th Cir. 2005). "The plausibility standard asks for more than a sheer possibility that a defendant has acted unlawfully. . . . the allegations in the complaint must be enough to raise a right to relief above the speculative level." *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1094 (11th Cir. 2017) (quotation marks and citation omitted).

### 1.  Title IX Claims (Counts One and Two)

In both Count One and Count Two, John Doe alleges that Samford discriminated against him, in violation of Title IX, by disciplining him based on his sex. (Doc. 1 at 26 ¶ 196, 29 ¶ 213). The difference between the two counts arises from the theory under which each count proceeds. In *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994), the Second Circuit set out two theories for Title IX claims of sex discrimination in university disciplinary proceedings: (1) the "erroneous outcome" theory, under which the plaintiff claims to be "innocent and

wrongly found to have committed an offense," and (2) the "selective enforcement" theory, under which the plaintiff claims that "the severity of the penalty and/or the decision to initiate the proceedings was affected by the student's gender."  In Count One, John Doe asserts an "erroneous outcome" claim, and in Count Two, he asserts a "selective enforcement" claim.  (Doc. 1 at 25, 29).  Samford moves to dismiss both claims.  (Doc. 13 at 6–25).

Title IX provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  "Neither the Supreme Court nor [the Eleventh Circuit] has established a framework for analyzing Title IX challenges to university disciplinary proceedings."  *Doe v. Valencia Coll.*, 903 F.3d 1220, 1236 (11th Cir. 2018).   In *Valencia College*, the Eleventh Circuit assumed the applicability of *Yusuf*'s erroneous outcome theory and noted the existence of the selective enforcement theory but "ma[d]e no comment (and indulge[d] no assumption) about" the applicability of that theory.  *Id.* at 1236 & n.13.  Samford criticizes the erroneous outcome theory (but not the selective enforcement theory) and asks this court not to use it.  (Doc. 13 at 7–11; *see id.* at 21–22).

This court notes that after the Eleventh Circuit issued *Valencia College*, several other Circuits declined to adopt the *Yusuf* theories, instead inquiring simply

whether the facts alleged raise a plausible inference that the university discriminated against a student "on the basis of sex." *See Doe v. Univ. of Denver*, 1 F.4th 822, 830 (10th Cir. 2021); *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 236 (4th Cir. 2021); *Doe v. Univ. of Arkansas-Fayetteville*, 974 F.3d 858, 864 (8th Cir. 2020); *Schwake v. Ariz. Bd. of Regents*, 967 F.3d 940, 947 (9th Cir. 2020); *Doe v. Univ. of Scis.*, 961 F.3d 203, 209 (3d Cir. 2020); *Doe v. Purdue Univ.*, 928 F.3d 652, 667 (7th Cir. 2019).   The court finds those cases persuasive.   Nothing in Title IX indicates that courts must use any specific doctrinal test to determine whether a plaintiff can state or prove a claim of sex discrimination.   *Cf. Ring v. Boca Ciega Yacht Club, Inc.*, 4 F.4th 1149, 1158 (11th Cir. 2021) (rejecting the use of a multi-factor balancing test in favor of following the plain language of a statute to determine whether a plaintiff established a claim).   The plain language of Title IX requires only that the plaintiff establish that sex was "the basis" for the school's action.   *See* 20 U.S.C. § 1681(a).

As the Fourth Circuit has explained, the statutory language—"on the basis of sex"—means that the plaintiff must allege and, eventually, prove but-for causation. *Sheppard*, 993 F.3d at 236–37; *see also Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014–15 (2020) ("[T]he essential elements of a claim remain constant through the life of a lawsuit. . . .   [W]hile the materials the plaintiff can rely on to show causation may change as a lawsuit progresses from

filing to judgment, the burden itself remains constant.").  Because this case is before the court on a motion to dismiss, the question is whether John Doe has alleged any facts that, taken as true and construed in his favor, establish that sex was "the basis" for Samford's actions.

John Doe framed both his complaint and his argument in response to the motion to dismiss under the *Yusuf* theories.  Because "either theory, with sufficient facts, may suffice to state a plausible [Title IX] claim," *Sheppard*, 993 F.3d at 236; *see also Univ. of Denver*, 1 F.4th at 830, and because John Doe asks the court to analyze his claims under those theories (doc. 1 at 25–31; doc. 37 at 11–22), the court will use them to determine whether he states a claim for sex discrimination under Title IX.

### a. Erroneous Outcome

To proceed under the erroneous outcome theory, a plaintiff must plead facts that, if true, would show "both that [the plaintiff] was 'innocent and wrongly found to have committed an offense' and that there is 'a causal connection between the flawed outcome and gender bias.'"  *Valencia Coll.*, 903 F.3d at 1236 (quoting *Yusuf*, 35 F.3d at 715).

Taking the facts of the complaint as true, John Doe has clearly alleged facts that, if true, would establish that he "was innocent and wrongly found to have committed an offense."  *Valencia Coll.*, 903 F.3d at 1236 (quotation marks omitted).

Under his version of events, Jane Roe was not incapacitated by alcohol or drugs, consented to have sex with him, and then falsely accused him of sexual assault. (Doc. 1 at 14 ¶ 83, 15 ¶¶ 90–97, 16 ¶ 101).   John Doe has also alleged various procedural irregularities in the investigation and hearing, such as Mr. Hebson's failure to provide John Doe with written notice and an initial meeting before Ms. Kruntorad began her investigation; Ms. Kruntorad's failure to pursue exculpatory evidence; and the provision of the entire unredacted investigation report to the Title IX Hearing Panel even though many of the witnesses whose testimony was summarized in it did not testify at the hearing.  (*Id.* at 17 ¶¶ 118–20, 21 ¶ 156, 22–23 ¶¶ 166–67).  These facts are sufficient for John Doe to adequately allege  that he was innocent and wrongly found to have committed the offense.

Having cleared that hurdle, the court must determine whether John Doe plausibly alleged that the flawed outcome was on the basis of John Doe's sex, or in *Yusuf* parlance, whether there was "a causal connection between the flawed outcome and gender bias." *Valencia Coll.*, 903 F.3d at 1236 (quotation marks omitted).  John Doe contends that he has alleged facts establishing this element because (1) the investigation and hearing were flawed; (2) the investigative report found Jane Roe credible despite inconsistencies in her statements; (3) the investigative report contained prejudicial hearsay statements; (4) Ms. Kruntorad said, while interviewing Jane Roe, that "I still think, regardless, you couldn't give consent";

(5) the school refused to give him copies of some of Jane Roe's medical records; (6) the Title IX Hearing Panel excluded some of his evidence; and (7) Samford participated in sexual misconduct public awareness campaigns. (Doc. 37 at 8–9, 12–20, *see also* Doc. 1 at 27–28). Samford argues that these facts are not enough to establish a plausible inference of gender bias. (Doc. 13 at 15–21).

Under *Yusuf*, a claim cannot survive a motion to dismiss merely by pointing to "a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination." 35 F.3d at 715. Although the Eleventh Circuit has not addressed what allegations would suffice to establish gender bias and causation, *see Valencia College*, 903 F.3d at 1236 (affirming the grant of summary judgment in favor of the defendant because the plaintiff had not presented any evidence that the outcome was erroneous, but declining to address "whether there is a causal connection between the outcome of the proceeding and gender bias"), other circuits have done so in the motion to dismiss and motion for summary judgment contexts.

In *Yusuf*, for example, the Second Circuit found that the plaintiff stated a claim where he alleged that "males accused of sexual harassment at [the school] are 'historically and systematically' and 'invariably found guilty, regardless of the evidence, or lack thereof.'" 35 F.3d at 716. Similarly, the Sixth Circuit found that the plaintiff stated a claim where he alleged: (1) "every male student accused of

sexual misconduct in the Fall 2013 and Spring 2014 semesters was found responsible for the alleged violation, and . . . nearly ninety percent of students found responsible for sexual misconduct between 2011 and 2014 have male first-names"; (2) the school had a pattern of "pursuing investigations concerning male students, but not female students"; (3) the school was facing "pressure from the government to vigorously combat sexual assault on college campuses"; (4) a female student had sued the school alleging that "she would not have been assaulted if the University had expelled her attacker for prior offenses"; and (5) the university initiated an investigation into the plaintiff's conduct against a female student but not the female student's conduct against him, despite her own written statement showing that she engaged in sexual misconduct. *Doe v. Miami Univ.*, 882 F.3d 579, 592–94 (6th Cir. 2018).

The Ninth Circuit has also found a plaintiff's allegations sufficient where he alleged that male respondents were "invariably found guilty, regardless of the evidence or lack thereof," he was personally aware of cases finding male respondents guilty despite a lack of evidence, the university was being investigated for its handling of sexual misconduct complaints, and a professor had publicly and repeatedly discussed the case against the plaintiff. *Schwake*, 967 F.3d at 948–50. In the summary judgment context, the Tenth Circuit has found that a plaintiff's claim survived where he presented evidence of the university's failure to "formally

investigate any of the twenty-one sexual-misconduct complaints brought by men from 2016 to 2018," while formally investigating 14 of the 105 complaints brought by women, and the university investigated one complaint filed by a female against another female, but failed to formally investigate any of the four complaints filed by males against females. *Doe v. Univ. of Denver*, 1 F.4th 822, 830–35 (10th Cir. 2021).

In another case, the Seventh Circuit found that the plaintiff stated a claim based on allegations that the school withheld the investigative report from him until moments before the hearing, when he was given a redacted version of the report that falsely claimed he had confessed to the allegations; two of the hearing panel members stated that they had not read the investigative report; the panel refused to allow the plaintiff to call any witnesses; and in the same month as the plaintiff's disciplinary proceeding, the school's center for supporting victims of sexual violence posted an article titled "Alcohol isn't the cause of campus sexual assault. Men are." *Doe v. Purdue Univ.*, 928 F.3d 652, 656–58, 669 (7th Cir. 2019).

Other courts have concluded that the plaintiff stated a claim based on allegations about media coverage and governmental investigations into the school's handling of sexual assault complaints. In *Doe v. University of Arkansas-Fayetteville*, 974 F.3d 858, 863 (8th Cir. 2020), the plaintiff alleged that during his disciplinary proceedings, the university was facing "several investigations regarding its past handling of sexual assault allegations made by female students against male

students."  The plaintiff also alleged that the university was receiving significant media attention including a "highly publicized" lawsuit by a female student alleging that the university failed to properly adjudicate her complaint of sexual assault against a male athlete.  *Id.*  The plaintiff further alleged that despite the Title IX coordinator finding that the plaintiff had not engaged in misconduct, the panel reversed course after the female complainant conducted a "media blitz" that criticized the decision and started a campus-wide protest.  *Id.* at 863–65.  In *Doe v. Columbia University*, 831 F.3d 46, 56–58 (2d Cir. 2016), the Second Circuit held that a plaintiff stated a claim based on allegations of significant irregularities in the disciplinary proceeding during a time when the university was facing "substantial criticism . . . both in the student body and in the public media, accusing the University of not taking seriously complaints of female students alleging sexual assault by male students," and that the Title IX investigator "had suffered personal criticism in the student body for her role in prior cases in which the University was seen as not taking seriously the complaints of female students."[2]

---

[2] The court notes that the Second Circuit has adopted a pleading standard in Title IX cases that is less than what the Supreme Court required in *Iqbal* and *Twombly*.  *See Univ. of Columbia*, 831 F.3d at 54 (adopting, in the Title IX context, the First Circuit's interpretation of the Supreme Court's *McDonnell Douglas* test for Title VII cases, and stating that the *McDonnell Douglas* presumption "reduces the facts needed to be pleaded under *Iqbal*") (emphasis omitted).  The Eleventh Circuit does not require a plaintiff to plead facts that would satisfy the *McDonnell Douglas* prima facie case in order to state a claim under Title VII.  *See Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1246 (11th Cir. 2015).  But even if it did, the court is persuaded that the Eleventh Circuit would not adopt a lessened pleading standard for Title VII or Title IX cases.

With respect to claims of media attention and government investigations into a school, the Sixth Circuit has held that "external pressure alone is not enough to state a claim that the university acted with bias." *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018).  But when combined with other allegations, such pressure could create an inference of bias.  In *Baum*, the other allegations were that the investigator had recommended finding in the plaintiff's favor because there was a lack of evidence showing that the female complainant had been incapacitated, but the panel, relying exclusively on female testimony and rejecting all male testimony, found that the plaintiff committed misconduct anyway.  *Id.* at 580, 587.  The Sixth Circuit highlighted that the panel rejected the male witnesses' testimony because they were the plaintiff's fraternity brothers, but accepted the female witnesses' testimony even though some of them were the complainant's sorority sisters.  *Id.* at 587.

In all of these cases, the plaintiff alleged facts (or presented evidence) that, if true, would show bias against men in the context of investigating and punishing sexual assault complaints.  John Doe has not done so.  He has alleged that Ms. Kruntorad was poorly trained and inexperienced (doc. 1 at 18 ¶¶ 130–31), that she failed to ask Jane Roe questions about how she became drunk and alternative causes for her hickeys and bruises (*id.* at 18–19 ¶¶ 134–35, 23 ¶ 169), and that she made the statement "I still think, regardless, you couldn't give consent" (*id.* at 18 ¶ 131).  These are certainly deviations from the Samford's procedures as set out in

its sexual misconduct policy.   But although they might sow doubt about the correctness of the outcome, they do not imply any particular anti-male bias on Ms. Kruntorad's part.   *Cf. Columbia Univ*., 831 F.3d at 58 (relying in part on allegations that the Title IX investigator "had suffered personal criticism in the student body for her role in prior cases in which the University was seen as not taking seriously the complaints of female students").   The same is true of John Doe's other challenges to the disciplinary proceedings, such as the failure to ask Jane Roe for medical documentation that she had been drugged, the failure to question her about how she could change from appearing sober to being incapacitated in twelve minutes, the inclusion of hearsay in the investigative report, and the failure to redact statements made by witnesses who were not testifying at the hearing.   (*See* Doc. 1 at 27–28).

The procedural irregularities could, if considered along with some other allegations supporting a reasonable inference of anti-male bias, suffice to state a claim.   But John Doe has not provided other allegations that support a reasonable inference of anti-male bias.   In his complaint, he alleges that Samford's "recent initiatives to curb sexual assault on its campus, along with its fear of public criticism and [Samford's] representative's statements in the media and campus newsletters which resulted in or from these initiatives, show a plausible inference of gender bias." (Doc. 1 at 29 ¶ 206).   But the only non-conclusory allegations he has provided

in support of that statement are that (1) a Fall 2019 edition of Inside Samford Magazine stated: "Once Prohibited Conduct is reported the Title IX Coordinator will conduct an initial assessment in which the well-being of the complainant is paramount"; (2) Samford has engaged in the "It's on Us Initiative," which states that "every 21 hours there is a rape on an American college campus"; (3) while John Doe's case was pending, the Title IX office showed a documentary called "Nevertheless," which was about sexual assault; and (4) only males have been accused of rape and fondling in the cases Samford reported in its Clery Report. (Doc. 1 at 7 ¶¶ 31–34, 30 ¶¶ 220–21; *see also* Doc. 37 at 17–18).

Nothing about these allegations supports a reasonable inference that anti-male bias caused the erroneous outcome. John Doe does not allege, nor does a reasonable reading of Samford's statement in the Inside Samford Magazine support, that Samford considers only the well-being of female complainants. Likewise, the statement from the "It's On Us Initiative" does not say anything about men. And John Doe does not indicate what, if anything, the documentary "Nevertheless" says about sexual assault that would support an inference of anti-male bias. Finally, to the extent John Doe relies on the fact that for three years, only men were accused of rape and fondling on Samford's campus, that fact indicates nothing about Samford's motivations in how it treat complaints of sexual assault. Samford does not control who complains of what crimes.

Although John Doe has alleged that Samford reached the wrong outcome in finding him responsible for sexual misconduct, he has not alleged facts supporting an inference that anti-male bias caused that outcome.  Accordingly, the court **WILL DISMISS** Count One **WITHOUT PREJUDICE**.

> b. *Selective Enforcement*

In Count Two, John Doe alleges that Samford discriminated against him in violation of Title IX because it selectively enforces its sexual misconduct policy against men.  (Doc. 1 at 29 ¶ 212, 30 ¶ 222).  Samford moves to dismiss this claim on the ground that he has not alleged the existence of any similarly situated member of the opposite sex who it treated more favorably than it treated him.  (Doc. 13 at 21–25).

Like the "erroneous outcome" theory, the "selective enforcement" theory comes from the Second Circuit's *Yusuf* decision.  35 F.3d at 715.  Under that theory, the plaintiff must allege facts showing that "the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender."  *Id.*  John Doe contends that the severity of the penalty—the five-year suspension—was the result of selective enforcement.  (Doc. 1 at 29 ¶ 213).  In support of that contention, his complaint states: "John was not treated as favorably as a female would be treated in a Title IX investigation" (*id.* at 29 ¶ 212) and "the males [accused of rape and fondling] were treated differently than a female would be treated if accused of a

similar offense" (*id.* at 30 ¶ 222).  His brief opposing dismissal argues that Samford treated Jane Roe more favorably than it treated him because it "permitt[ed] Jane to continually change her story and discount[ed] John's evidence and testimony." (Doc. 37 at 21).

John Doe's statements that a "female would be treated" more favorably than he was treated are utterly conclusory.  *See Twombly*, 550 U.S. at 555 (quoting another case's statement that "courts are not bound to accept as true a legal conclusion couched as a factual allegation").  And he alleges no other facts indicating that Samford has received any formal complaints about sexual assault against female students.  Even taking all of John Doe's non-conclusory allegations as true, he cannot show that Samford treats sexual assault complaints against female respondents any differently than it treats sexual assault complaints against male respondents if he cannot point to a female respondent.  *See Austin v. Univ. of Oregon*, 925 F.3d 1133, 1138 (9th Cir. 2019) ("[T]he complaint does not claim that any female University students have been accused of comparable misconduct, and thus fails to allege that similarly situated students—those accused of sexual misconduct—are disciplined unequally.").  Accordingly, the court **WILL GRANT** the motion to dismiss Count Two and **WILL DISMISS** that claim **WITHOUT PREJUDICE**.

2.  <u>State Law Claims</u>

The remaining three claims allege claims under Alabama law for breach of contract, breach of the covenant of good faith and fair dealing, and negligence.  (Doc. 1 at 31–34).  The court has jurisdiction over those claims based only on supplemental jurisdiction.  *See* 28 U.S.C. § 1367(a); (Doc. 1 at 3 ¶ 14).  When a court "has dismissed all claims over which it has original jurisdiction," it may decline to exercise supplemental jurisdiction over the state law claims.  28 U.S.C. § 1367(c)(3).  Because the court has dismissed the only federal claims in this action, the court **DECLINES** to exercise supplemental jurisdiction and **WILL DISMISS** Counts Three, Four, and Five **WITHOUT PREJUDICE** for lack of subject matter jurisdiction.

## III.   CONCLUSION

The court **WILL GRANT** Defendants' motion to dismiss the complaint.  The court **WILL DISMISS** Counts One and Two **WITHOUT PREJUDICE** for failure to state a claim.  The court **WILL DISMISS** Counts Three, Four, and Five **WITHOUT PREJUDICE** for lack of subject matter jurisdiction.

This ruling moots the requests for declaratory and injunctive relief.  Accordingly, the court **CANCELS** the hearing set for August 24, 2021.

The court will enter a separate final order consistent with this memorandum opinion.

**DONE** and **ORDERED** this August 15, 2021.

_____

**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE